**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CHRISTINA HOLMES,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL ACTION NO. 3:15-CV-02117-L** |
| **NORTH TEXAS HEALTH CARE** | § | |
| **LAUNDRY    COOPERATIVE** | § | |
| **ASSOCIATION,    d/b/a    NORTH** | § | |
| **TEXAS HEALTH CARE LAUNDRY,** | § | |
| | § | |
| *Defendant.* | § | |

**BRIEF IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Monte K. Hurst
State Bar No. 00796802
<u>Monte.Hurst@hallettperrin.com</u>

Jennifer R. Poe
State Bar No. 00794470
<u>JPoe@hallettperrin.com</u>

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

*Counsel for Defendant North Texas Health
Care Laundry Cooperative Association
d/b/a North Texas Health Care Laundry*

# <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES ............................................................................................... iii

I. SUMMARY ....................................................................................................... 1

II. SUMMARY JUDGMENT EVIDENCE ........................................................... 2

III. BACKGROUND FACTS .................................................................................. 3

IV. SUMMARY JUDGMENT STANDARD ......................................................... 14

V. ARGUMENT & AUTHORITIES .................................................................... 14

    A. Ms. Holmes' Harassment and Retaliation Claims ................................. 14

        1. The conduct about which Ms. Holmes now complains was not, and could not possibly be considered, unwelcome or univited ................ 15

        2. Ms. Holmes cannot demonstrate that the purported "harassment" affected a term, condition, or privelege of her employment ..................... 21

        3. NTHCL is entitled to summary judgment on its *Ellerth/Faragher* affirmative defense....................................................................................... 24

    B. Ms. Holmes' Intentional Infliction of Emotional Distrress Claim ........................ 25

    C. Ms. Holmes' Negligence and Gross Negligence Claims........................................ 25

    D. Ms. Holmes' Assault and Battery Claims............................................................... 26

    E. Ms. Holmes' Negligent Investigation Claims........................................................ 28

VI. PRAYER............................................................................................................ 29

VII. REQUEST FOR ORAL ARGUMENT ............................................................ 29

CERTIFICATE OF SERVICE ........................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

## <u>Cases</u>

*Brimmer v. Shinseki,*
    Civil Action No. 3:11-CV-1956-L, 2013 WL 4763947 (N.D. Tex. Sept. 5, 2013)................15

*Carr v. Allison Gas Turbine Div., General Motors Corp.,*
    32 F. 3d 1007 (7th Cir. 1994) ........................................................................................15, 21

*Davis v. Wal-Mart Stores, Inc.,*
    Civil Action No. 3:05-CV-1805-L, 2007 WL 836860 (N.D. Tex. Mar. 19, 2007) ................22

*Dye v. BNSF Ry. Co.,*
    CV-14-150-BLG-CSO, 2016 WL 492755 (D. Mont. Feb. 8, 2016) ................................20, 21

*Greco v. Velvet Cactus, LLC,*
    Civil Action No. 13-3514, 2014 WL 2943600 (E.D. La. Jun. 27, 2014) ...............................15

*Kenyon v. Western Extrusions Corp.,*
    No. Civ. A. 3:98CV2431L, 2000 WL 12902 (N.D. Tex. Jan. 6, 2000) ................................22

*Lacher v. Principi,*
    No. Civ A. 3:99-CV-2937L, 2002 WL 1033089 (N.D. Tex. May 20, 2002) ...................22, 23

*Loftin-Boggs v. City of Meridian, Miss.,*
    633 F. Supp. 1323 (S.D. Miss. 1986),
    *aff'd*, 824 F.2d 971, *cert. denied*, 484 U.S. 1063 (1988) ........................................................20

*Meritor Savings Bank, FSB v. Vinson,*
    477 U.S. 57 (1986)....................................................................................................15, 16

*Moyer v. Jos. A. Bank Clothiers, Inc.,*
    Civil Action No. 3:11-CV-3076-L,
    2013 WL 4434901 (N.D. Tex. Aug. 19, 2013)...............................................15, 21, 22, 24, 25

*Piccone v. Town of Webster,*
    No. 09-CV-6266 (MAT), 2011 WL 3322550 (W.D.N.Y. Aug. 2, 2011)...............................22

*Quintana v. Fujifilm N. Am. Corp.,*
    96 F. Supp. 3d 601 (N.D. Tex. 2015)................................................................................14

*Thawar v. 7-Eleven, Inc.,*
    165 F. Supp. 3d 524 (N.D. Tex. 2016) ..............................................................................26

## TABLE OF AUTHORITIES (CONT.)

*Page(s)*

### Cases (Cont.)

*Ukarish v. Magnesium Elektron*,
  Civil Action No. 81-638, 1983 WL 593 (D.N.J. Mar. 1, 1983)................................................15

*Walker v. SBC Servs., Inc.*,
  375 F. Supp. 2d 524 (N.D. Tex. 2005) ...........................................................14, 21, 22, 23, 24

*Zhao v. Kaleida Health*,
  No. 04-CV-467-JTC(JJM), 2008 WL 346205 (W.D.N.Y. Feb. 7, 2008).........................15, 16

### Other Sources

EEOC, Policy Guidance on Current Issues of Sexual Harassment,
EEOC Notice No. 915-050 (Mar. 19, 1990), 1990 WL 1104701..................................................15

Defendant North Texas Health Care Laundry Cooperative Association d/b/a North Texas Health Care Laundry ("NTHCL") files this Brief in Support of Defendant's Motion for Summary Judgment.

# I.
# SUMMARY

This is a story of a woman who, after engaging in a consensual sexual relationship with a man she met at work, would now claim that those instances of collective passion and companionship were actually acts of sexual harassment and assault. The woman hid the relationship from her boyfriend, her mother and everyone else, and she never reported to her employer that she felt mistreated in any way. To the contrary, among the hundreds of e-mail messages that were secretly exchanged between the two people involved in the affair are her articulations of how much she thinks about him and how good it feels when they are together.

This woman asserts sexual harassment and tort claims against her former employer, but not against the man who she now claims harassed and assaulted her. Nevertheless, her sexual harassment claim must fail because, as evidenced by her behavior, and the plethora of graphic e-mail messages, she welcomed and even encouraged the relationship, and the relationship most certainly did not affect her job performance. Additionally, she never reported any harassment or mistreatment to her employer.

Likewise, she cannot sustain her claims of intentional infliction of emotional distress, negligence and assault and battery because each such claim is preempted by the federal employment law statute under which she has chosen to sue, is not available to her under these facts, and/or is factually irreconcilable with the undisputed summary evidence showing the consensual nature of the affair.

## II.
## SUMMARY JUDGMENT EVIDENCE

In support of its Motion for Summary Judgment, NTHCL relies on the pleadings on file in this matter as well as the following evidence, which is included in the Appendix in Support of Defendant's Motion for Summary Judgment, filed contemporaneously:[1]

| DESCRIPTION | PAGE(S) |
|---|---|
| Excerpts from the Deposition of Christina H. Holmes—Vol. 1 (March 16, 2016) ("Holmes Depo. Vol. 1) | APP1–APP57 |
| Excerpts from the Deposition of Christina H. Holmes—Vol. 2 (April 12, 2016) ("Holmes Depo. Vol. 2") | APP58–APP381 |
| Excerpts from the Deposition of Christina H. Holmes—Vol. 3 (May 12, 2016) ("Holmes Depo. Vol. 3") | APP382–APP385 |
| Excerpts from the Deposition of Gary E. Dutchover, Jr. (April 5, 2016) ("Dutchover Depo.") | APP386–APP394 |
| Excerpts from the Deposition of Phillip C. Foussard—Vol. 1 (April 26, 2016) ("Foussard Depo. Vol. 1") | APP395–APP408 |
| Excerpts from the Deposition of Phillip C. Foussard—Vol. 2 (July 12, 2016) ("Foussard Depo. Vol. 2") | APP409–APP416 |

---

[1] Exhibit 32 to the deposition of Plaintiff Christina Holmes ("Ms. Holmes"), which is included in the Appendix at 81–381, is comprised of hundreds of e-mail exchanges between Ms. Holmes and David Hernandez ("Mr. Hernandez"), arranged chronologically. NTHCL could discuss only some of these e-mail messages in this brief. Nevertheless, NTHCL felt compelled to include all of these e-mail messages in the Appendix, to demonstrate their frequency and content. NTHCL and its counsel apologize to the Court, as many of these e-mail messages contain explicit language and graphic sexual references. NTHCL means no disrespect by quoting some of these e-mail messages uncensored in this brief.

NTHCL's counsel applied color highlights to particular portions of the e-mail and text messages exchanged between Ms. Holmes and Mr. Hernandez, to illustrate the frequency and nature of certain categories, as follows:

Ms. Holmes' expression of welcomeness toward Mr. Hernandez
Ms. Holmes' expression of attraction toward Mr. Hernandez
Ms. Holmes' sexual/graphic message to Mr. Hernandez
Ms. Holmes' expression of missing/wanting Mr. Hernandez
Ms. Holmes' expression of love toward Mr. Hernandez
Ms. Holmes' referencing a provocative or romantic song, likening the song's lyrics to her feelings for Mr. Hernandez
Ms. Holmes' expression of fantasy involving her and Mr. Hernandez
Ms. Holmes' complaint/comment about Gary Dutchover ("Mr. Dutchover"), her boyfriend/fiancé
General/random message from Ms. Holmes
Message from Mr. Hernandez

| Description | Page(s) |
|---|---|
| Excerpts from the Deposition of Robin E. Holmes (April 5, 2016) ("R. Holmes Depo.) | APP417–APP429 |
| Excerpts from the Deposition of Tim Montague (July 12, 2016) ("Montague Depo.") | APP430–APP442 |
| Affidavit of David Hernandez (November 11, 2016) | APP443–APP473 |
| Affidavit of Mary Khan (November 18, 2016) | APP474–APP489 |
| Affidavit of Brent Beers, CCE, ACE (November 17, 2016) | APP490–APP495 |
| Affidavit of Leslie Bradberry (November 18, 2016) | APP496–APP547 |
| Affidavit of Dallas Broadway (November 17, 2016) | APP548–APP552 |
| Affidavit of Monte K. Hurst (November 17, 2016) | APP553–APP559 |

## III.
## BACKGROUND FACTS

NTHCL is a specialty laundry service based in Grand Prairie, Texas.[2]  It was formed in 1995 as a cooperative among three major hospitals in the Dallas-Fort Worth area.[3]  The purpose of the cooperative was to have linens from the three hospitals processed at one location.[4]  Today, NTHCL has expanded to provide clean linens to over 50 hospitals and health clinics throughout Texas.[5]

Foussard Montague Associates, Inc. ("FMA") acts as the management company for NTHCL.[6]  In this role, FMA provides NTHCL with a General Manager who is an employee of FMA, but who works out of the NTHCL facility in Grand Prairie.[7]  At the time of the events in question, FMA employee Mr. Hernandez was NTHCL's General Manager.[8]  Mr. Hernandez interviewed with FMA for the NTHCL General Manager position in October of 2010 as part of a nationwide search

---

[2] Hernandez Aff. ¶ 3 (APP444); Khan Aff. ¶ 2 (APP474).
[3] Hernandez Aff. ¶ 3 (APP444); Khan Aff. ¶ 2 (APP474).
[4] Hernandez Aff. ¶ 3 (APP444); Khan Aff. ¶ 2 (APP474).
[5] Khan Aff. ¶ 2 (APP474).
[6] Hernandez Aff. ¶ 3 (APP444); Khan Aff. ¶ 9 (APP476).
[7] Hernandez Aff. ¶ 4 (APP444).
[8] Hernandez Aff. ¶ 3 (APP444).

8

to fill the position.[9]  At the time, Mr. Hernandez was working for Aramark.[10]  FMA reached out to several contacts at Aramark to determine what kind of employee Mr. Hernandez was.[11]  FMA was told that Mr. Hernandez was up for a promotion at Aramark, and that he was "a good guy" who "knows the business" and "employees like him."[12]  FMA also made inquiries regarding Mr. Hernandez to two of its vendors who had worked with him, one of whom is the mother of Ms. Holmes, Robin Holmes.[13]  Both Robin Holmes and the other vendor gave FMA positive feedback about Mr. Hernandez.[14]

As NTHCL's General Manager, Mr. Hernandez was responsible for the day-to-day operations of NTHCL's facility.[15]  However, FMA's principals, Phillip Foussard ("Mr. Foussard") and Tim Montague ("Mr. Montague"), made frequent visits to NTHCL during Mr. Hernandez's tenure as General Manager.[16]

In the summer of 2013, NTHCL was looking to hire a Customer Service Representative.[17]  Normally, NTHCL used contractors for its Customer Service Representatives.  In this instance, NTHCL wanted to hire a Customer Service Representative as a direct, hourly employee of NTHCL.[18]  The reason for this change was that NTHCL's Customer Service Manager, Jake McCuiston ("Mr. McCuiston"), had recently graduated from college and had informed NTHCL that he was planning to leave the company in the near future to pursue a position in hospital

---

[9] Foussard Depo. Vol. 1 at 22:21-23:8 (APP398).
[10] Foussard Depo. Vol. 1 at 23:11-13 (APP398).
[11] Foussard Depo. Vol. 1 at 23:21-24:7 (APP398).
[12] Foussard Depo. Vol. 1 at 23:21-24:7, 29:24-30:16 (APP398 and APP400); *see also,* Foussard Depo. Vol. 1 at 40:20-41:1 (APP401-APP402). In fact, Aramark asked FMA not to pursue Mr. Hernandez as an employee because of the promotion for which he was being considered. Foussard Depo. Vol. 1 at 23:21-24:7 (APP398).
[13] Foussard Depo. Vol. 1 at 25:7-26:22 (APP399).
[14] Foussard Depo. Vol. 1 at 26:8-13, 26:17-22 (APP399).
[15] *See* Hernandez Aff. ¶ 4 (APP444).
[16] *See* Foussard Depo. Vol. 1 at 31:20-32:2 (APP400); 44:4-17 (APP402); Foussard Depo. Vol. 2 at 22:7-22 (APP410); *see also* Foussard Depo. Vol. 1 at 11:18-23 (APP396); Montague Depo. at 8:8-16 (APP431).
[17] *See* Hernandez Aff. ¶¶ 5, 7 (APP444); Khan Aff. ¶ 5 (APP475).
[18] Hernandez Aff. ¶ 7 (APP444).

administration.[19]  The expectation was that the person hired in the Customer Service Representative position would ultimately move up into the Customer Service Manager position whenever Mr. McCuiston resigned.[20]

On July 15, 2013, Ms. Holmes was hired by NTHCL to fill the Customer Service Representative position.[21]  Mr. McCuiston made the decision to hire Ms. Holmes, but Mr. Hernandez had also participated in the interview process prior to Ms. Holmes' being offered the job.[22]  Although Mr. Hernandez knew Robin Holmes through the laundry business prior to Ms. Holmes' being hired by NTHCL, Mr. Hernandez had not met Ms. Holmes before her job interview at NTHCL.[23]

Mary Khan ("Ms. Khan") is NTHCL's Human Resources Manager, and her office is located at NTHCL's Grand Prairie facility as well.[24]  It is part of her job to conduct orientations for NTHCL's new hires.[25]  On July 15, 2013, Ms. Holmes met with Ms. Khan to review and complete her employee paperwork and review safety videos.[26]  Ms. Holmes was provided a new-hire packet from Ms. Khan, which included a copy of NTHCL's Employee Handbook.[27]  Together, Ms. Khan and Ms. Holmes, reviewed sections of the Employee Handbook, and Ms. Holmes signed an acknowledgment page confirming that she received and would read the Employee Handbook.[28]

---

[19] Hernandez Aff. ¶ 7 (APP444).
[20] Hernandez Aff. ¶ 7 (APP444).
[21] Hernandez Aff. ¶ 7 (APP444).
[22] Hernandez Aff. ¶¶ 5-6 (APP444).
[23] Hernandez Aff. ¶ 5 (APP444).  Robin Holmes had also known and been friendly with Mr. Foussard and Mr. Montague for "many years."  R. Holmes Depo. at 26:24-27-:22 (APP418).
[24] Khan Aff. ¶¶ 2, 4 (APP474-APP475).
[25] *See* Khan Aff. ¶ 6 (APP476)
[26] Khan Aff. ¶ 6 (APP476); *see also* Holmes Depo. Vol. 1 at 134:12-135:20 (APP16).
[27] Khan Aff. ¶ 6 (APP476).
[28] Khan Aff. ¶ 6 (APP476); Khan Aff. Ex. 1 (APP481); *see also* Holmes Depo. Vol. 1 at 129:25-130:9, 132:9-11 (APP15); Holmes Depo. Vol. 1 Ex. 9 (APP46). During her meeting with Ms. Khan, Ms. Holmes also signed NTHCL's pledge of respect in the workplace.  Khan Aff. ¶ 6 (APP476); Khan Aff. Ex. 2 (APP476).

NTHCL's Employee Handbook contains a clear "Policy Against Harassment."[29]   This policy states the following:

> North Texas Health Care Laundry Cooperative Association is committed to providing a work place that is free of unlawful discrimination based on race, color, religion, national origin, sex, disability, age or citizenship.   Unlawful harassment, including that of sexual nature, is also prohibited.   ***Sexual harassment is strictly prohibited***.   Unwelcome sexual advances, requests for sexual favor, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when submission to such conduct is either explicitly or implicitly made a condition of employment, used as a basis for employment decisions, or has the purpose or effect of unreasonably interfering with work performance or creates a hostile atmosphere.
>
> Employment means anything that affects the employment relationship.   Examples include promotions, disciplinary actions and work assignments.   Sexual harassment also includes, but is not limited to, unsolicited and unwelcome sexually related comments or jokes, touching, art work, magazines or calendars.   ***If you believe you have been sexually harassed, you are expected to report it promptly*** to your manager or supervisor or General Manager.
>
> An investigation will follow.   Any warranted corrective action will be taken.   Retaliation against any employee who has reported a sexual harassment complaint is strictly prohibited.[30]

At the time Ms. Holmes began working for NTHCL, Mr. McCuiston was the Customer Service Manager, and Ms. Holmes reported to him.[31]   By September 2013, Mr. McCuiston had found another job and tendered his resignation from NTHCL.[32]   At that time, FMA made the decision to transition another NTHCL employee, Willy Chavez ("Mr. Chavez"), into the Customer Service Manager position.[33]   Accordingly, Mr. Chavez became Ms. Holmes' direct supervisor.[34]

---

[29] *See* Holmes Depo. Vol. 1 Ex. 8 (APP44-APP45).
[30] Holmes Depo. Vol. 1, Ex. 8 (APP44-APP45) (emphasis added).
[31] *See* Hernandez Aff. ¶ 10 (APP445); Khan Aff. ¶ 8 (APP476).
[32] Hernandez Aff. ¶ 10 (APP445).
[33] Hernandez Aff. ¶ 10 (APP445).
[34] Hernandez Aff. ¶ 10 (APP445); Khan Aff. ¶ 8 (APP476).

Both while Mr. McCuiston was Customer Service Manager, and after Mr. Chavez's stepping into that role, Ms. Holmes communicated directly with Mr. Hernandez.[35]   These communications included both text messages and e-mail messages, as well as messages using NTHCL's Lync System, which is part of the Microsoft Outlook e-mail service.[36]   These communications were often initiated by Ms. Holmes, and they frequently used a very informal, and sometimes even playful, tone.[37]   For example, Ms. Holmes referred to Mr. Hernandez as a "slacker" and called him "a jerk."[38] Ms. Holmes would also reach out to Mr. Hernandez just to, in her words, "bug" him or be "nosey."[39]

In October 2013, Ms. Holmes and Mr. Hernandez began playing harmless practical jokes on one another.[40]   Robin Holmes had encouraged Mr. Hernandez to leave fake spiders on Ms. Holmes' desk because Ms. Holmes was afraid of spiders.[41]   Ms. Holmes and Mr. Hernandez would also disorganize each other's desks and place items from vendors on each other's desks.[42]   Ms. Holmes did not complain about these practical jokes or indicate to Mr. Hernandez that she was in any way offended by them.[43]   Rather, she continued to engage in the inoffensive joke playing on Mr. Hernandez.[44]

---

[35] *See* Hernandez Aff. ¶ 11 (APP445).

[36] Hernandez Aff. ¶¶ 12-13 (APP445-APP446). NTHCL was able to retrieve a number of text messages from Ms. Holmes' damaged company iPhone. *See generally* Beers Aff. (APP490-APP493); Broadway Aff. (APP548-APP550). The text messages between Ms. Holmes and Mr. Hernandez that were retrieved from Ms. Holmes' iPhone were then sorted and put in chronological order. *See generally* Bradberry Aff. (APP496-APP498).

[37] *See, e.g.*, Holmes Depo. Vol. 1 at 193:10-16, 193:22-194:6, 194:9 (APP26); Holmes Depo. Vol. 1 Ex. 10 (APP47-APP49), Ex. 16 (APP53), and Ex. 17 (APP54-APP55).

[38] *See* Bradberry Aff. Ex. 1 (APP501, APP508, APP517 and APP523); Holmes Depo. Vol. 1, Ex. 12 (APP50-APP52); Hernandez Aff. Ex. 1 (APP456).

[39] Bradberry Aff. Ex. 1 (APP508-APP509, APP516 and APP539); Holmes Depo. Vol. 1, Ex. 12 (APP50-APP52); *see also* Holmes Depo. Vol. 1 at 202:16-20, 203:1-16, 204:19-205:8 (APP28-APP29).

[40] Hernandez Aff. ¶ 11 (APP445).

[41] Hernandez Aff. ¶ 11 (APP445); R. Holmes Depo. at 81:3-10 (APP423). Robin Holmes also observed "flirtatious" behavior at a lunch she attended with her daughter and Mr. Hernandez; however, she did not comment on such behavior either to Mr. Hernandez or to Ms. Holmes. R. Holmes Depo. at 79:4-80:1 (APP422). Robin Holmes also saw no indication that her daughter was made uncomfortable by Mr. Hernandez's behavior. R. Holmes Depo. at 80:2-5 (APP422).

[42] Hernandez Aff. ¶ 11 (APP445).

[43] Hernandez Aff. ¶ 11 (APP445).

[44] Hernandez Aff. ¶ 11 (APP445).

Ms. Holmes would complain to Mr. Hernandez about Mr. Chavez and attempt to have Mr. Hernandez intervene when she did not like what Mr. Chavez was doing or was asking her to do.[45]  For example, Ms. Holmes reached out to Mr. Hernandez when Mr. Chavez asked Ms. Holmes to prepare certain reports for NTHCL's Board on short notice.[46]

By early October 2013, it was time for Ms. Holmes' 90-day review, and she asked Mr. Hernandez if he or Mr. Chavez would be conducting her review.[47]  Mr. Hernandez responded that Mr. Chavez would be reviewing her, to which Ms. Holmes responded: "Dang it!  I doubt he [Mr. Chavez] will give me the amount I was expecting."[48]

As time went on, Ms. Holmes continued to initiate communication with Mr. Hernandez, including by responding to Mr. Hernandez's group e-mail messages by replying to him alone.[49]  Ms. Holmes began to come into Mr. Hernandez's office on a more regular and frequent basis, often to discuss trivial matters that did not really require his input.[50]  Mr. Hernandez came to believe that Ms. Holmes was simply finding excuses to come to his office.[51]

By March of 2014, the relationship between Ms. Holmes and Mr. Hernandez had become more personal.  Ms. Holmes texted Mr. Hernandez a link to "Gorilla," a sexually graphic song by Bruno Mars.[52]  Ms. Holmes would later refer to this song as "sexy," and tell Mr. Hernandez that, when she heard the song on the radio, she could "feel [him] when [she] hear[s] it."[53]

---

[45] Hernandez Aff. ¶ 11 (APP445).
[46] Hernandez Aff. Ex. 3 (APP461-APP463); *see also* Bradberry Aff. Ex. 1 (APP500) ("I don't have any issue with doing the reports. I just don't like that he is telling me the day before to get it done and turned in all in 1 day.").
[47] Hernandez Aff. ¶ 15 (APP446).
[48] Hernandez Aff. ¶ 15 (APP446); Hernandez Aff. Ex. 5 (APP467-APP468); *see also* Holmes Depo. Vol. 1 at 188:2-189:8 (APP24-APP25).
[49] *See, e.g.*, Holmes Depo. Vol. 1 at 223:23-224:2, 224:7-10, 224:20-22, 225:1-8 (APP30-APP31); Holmes Depo. Vol. 1, Ex. 17 (APP54-APP55); *see also* Holmes Depo. Vol. 1 at 222:20-223:7, 223:14-19, 20 (APP30); Holmes Depo. Vol. 1, Ex. 16 (APP53).
[50] Hernandez Aff. ¶ 18 (APP447).
[51] Hernandez Aff. ¶ 18 (APP447).
[52] Hernandez Aff. ¶ 19 (APP447); *see also* Bradberry Aff. Ex. 1 (APP544).
[53] Holmes Depo. Vol. 2, Ex. 32 (APP92, APP148 and APP167).

Ms. Holmes suggested to Mr. Hernandez that they find a more private way to communicate.[54] Mr. Hernandez already had a Gmail account that he rarely used, "dalyd72@gmail.com."[55] Ms. Holmes created her own Gmail account under the name "missevasive1@gmail.com."[56] Ms. Holmes and Mr. Hernandez proceeded to use these private Gmail accounts to communicate with each other.  Often, they would send messages over NTHCL's Lync System to alert one another that e-mail messages had been sent to the Gmail accounts.[57]

Ms. Holmes sent the first Gmail message to Mr. Hernandez on March 13, 2014.[58]  Thereafter, she and Mr. Hernandez exchanged hundreds of e-mail messages using their Gmail accounts.[59]  Many of these e-mail messages, authored by both Ms. Holmes and Mr. Hernandez, were of a sexually graphic nature.[60]  In addition, Ms. Holmes would frequently write to Mr. Hernandez that she missed him,[61] wanted to be with him,[62] and even that she loved him.[63]

The relationship between Ms. Holmes and Mr. Hernandez progressed into a physical relationship in mid-March 2014.[64]  They would meet in parking lots as well as at the NTHCL facility during the early morning hours to engage in sexual relations.[65]  On several occasions, they went to hotels to engage in sexual relations.[66]  Their Gmail e-mail communications continued, and

---

[54] Hernandez Aff. ¶ 20 (APP447).
[55] Hernandez Aff. ¶ 20 (APP447).
[56] Hernandez Aff. ¶ 21 (APP448).  Ms. Holmes used her "missevasive1" Gmail account only to communicate with Mr. Hernandez.  Holmes Depo. Vol.1 at 40:8-16 (APP6); *see also* Holmes Depo. Vol. 1 at 27:87-14 (APP5).
[57] Hernandez Aff. ¶ 20 (APP447); Hernandez Aff. Ex. 6 (APP470-APP471).
[58] Hernandez Aff. ¶ 21 (APP448); Holmes Depo. Vol. 1, Ex. 18 (APP56-APP57); *see also* Holmes Depo. Vol. 1 at 233:16-19, 234:3-19, 236:2-22, 237:3-6, 237:11-13, 237:15-238:15 (APP32-APP33).
[59] *See generally* Holmes Depo. Vol. 2, Ex. 32 (APP81-APP381); Holmes Depo. Vol. 2 at 388:3-6, 15-18, 20 (APP70).
[60] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP84, APP104, APP124, APP130, APP132, APP146, APP159, APP177 and APP192); Holmes Depo. Vol. 1 at 122:12-18 (APP13).
[61] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP86, APP111, APP145, APP156 and APP179).
[62] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP101, APP159, APP185, APP200 and APP213).
[63] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP162, APP180, APP202-APP203, APP212, APP215, APP221, APP227, APP244, APP273 and APP276-APP277).
[64] Hernandez Aff. ¶ 21 (APP448).
[65] Hernandez Aff. ¶¶ 22, 23, 26, 27 (APP448-APP449).
[66] Hernandez Aff. ¶¶ 28, 29, 31 (APP449-APP450).

Ms. Holmes continued to express that she was enjoying the relationship between the two of them and wanted it to endure.[67]

While she was engaging in her affair with Mr. Hernandez, Ms. Holmes was living with her boyfriend, Mr. Dutchover.   Ms. Holmes frequently complained to Mr. Hernandez about Mr. Dutchover's behavior, and she expressed concern that Mr. Dutchover would find out about their affair.[68]  Mr. Hernandez was sympathetic to Ms. Holmes' concerns, and he told her he understood that she one day may have to put her relationship with Mr. Dutchover first.[69]

In early to mid-April 2014, Ms. Holmes got engaged to Mr. Dutchover and began to plan a wedding.[70]  At that time, Ms. Holmes said that she wanted to take a "break" from Mr. Hernandez; but, she insisted it was not a "break up."[71]  Mr. Hernandez agreed; however, Ms. Holmes and he continued to communicate and even "hook up."[72]  Ms. Holmes also acted in a jealous manner after seeing Mr. Hernandez with an attractive female vendor.[73]   Finally, on or about May 1, 2014, Ms. Holmes told Mr. Hernandez that she planned to tell Mr. Dutchover that she had been having an affair, but she would keep Mr. Hernandez's identity a secret.[74]

On Saturday, May 3, 2014, Mr. Dutchover called Mr. Hernandez several times, ranting that he knew about Mr. Hernandez's affair with Ms. Holmes.[75]  During one of these calls, Mr. Dutchover threatened to kill Mr. Hernandez.[76]  Mr. Dutchover never accused Mr. Hernandez of having forced Ms. Holmes into anything, and he never mentioned the words "rape" or "assault."[77]

---

[67] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP204, APP217 and APP245).
[68] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP96-APP97, APP185-APP186, APP195, APP209, APP211 and APP242)
[69] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP281 and APP328); *see also* Hernandez Aff. ¶ 30 (APP450).
[70] Hernandez Aff. ¶ 35 (APP451).
[71] Holmes Depo. Vol. 2, Ex. 32 (APP311).
[72] Hernandez Aff. ¶¶ 36, 37 (APP451).
[73] Hernandez Aff. ¶ 40 (APP452); Holmes Depo. Vol. 2, Ex. 32 (APP381); Bradberry Aff., Ex. 1 (APP547); *see also* R. Holmes Depo. at 85:20-86:12 (APP424).
[74] Hernandez Aff. ¶¶ 36, 37 (APP451).
[75] Hernandez Aff. ¶ 42 (APP452).
[76] Hernandez Aff. ¶ 42 (APP452).
[77] Hernandez Aff. ¶ 42 (APP452).

Mr. Dutchover then called Mr. Hernandez's wife to tell her of her husband's relationship with Ms. Holmes.[78]  When Mr. Dutchover was on the phone with her, Mr. Hernandez's wife put the call on speaker so that Mr. Hernandez could also hear the conversation.[79]  Mr. Hernandez heard Mr. Dutchover again refer to the "affair" between Ms. Holmes and Mr. Hernandez, and he heard Mr. Dutchover order Ms. Holmes to get on the phone with Mr. Hernandez's wife to tell her what had happened.[80]  Ms. Holmes apologized to Mr. Hernandez's wife for having "gone out" with Mr. Hernandez.[81]  Ms. Holmes never mentioned "rape" or "sexual assault."[82]

According to Ms. Holmes' mother, Mr. Dutchover had confronted Ms. Holmes on May 3, 2014, and Ms. Holmes had confessed the affair.[83]  Mr. Dutchover called off the wedding and took his engagement ring back.[84]  He also destroyed Ms. Holmes' NTHCL-issued iPhone and tablet.[85]

Mr. Dutchover also reached out to one of FMA's principals, Mr. Montague, via phone and text message on Saturday, May 3, 2014.[86]  Mr. Dutchover informed Mr. Montague about the affair between Ms. Holmes and Mr. Hernandez.  Mr. Montague asked to speak with Ms. Holmes, and he was able to do so briefly.[87]  Mr. Montague wanted to meet with Ms. Holmes to discuss what had happened, and he made arrangements to travel to Grand Prairie on Monday, May 5, 2014.[88]

---

[78] Dutchover Depo. at 100:9-24, 101:71-19, 103:22-104:19 (APP388-APP389).
[79] Hernandez Aff. ¶ 42 (APP452).
[80] Hernandez Aff. ¶ 42 (APP452).
[81] Hernandez Aff. ¶ 42 (APP452).
[82] Hernandez Aff. ¶ 42 (APP452).  Despite Ms. Holmes' allegation(s) of "rape" in this lawsuit, she never reported any such allegation(s) to the police.  Holmes Depo. Vol. 1 at 305:21-306:2 (APP62); Holmes Depo. Vol. 2 at 347:19-21 (APP64); *see also* R. Holmes Depo at 46:11-25 (APP421); R. Holmes Depo. at 108:10-12 (APP425).
[83] *See* R. Holmes Depo. at 34:1-16 (APP419).
[84] Holmes Depo. Vol. 1 at 45:14-17, 47:10-18, 48:20-22 (APP7).
[85] Holmes Depo. Vol. 1 at 21:23-22:15 (APP4).
[86] Montague Depo. at 12:10-13:1 (APP432-APP433); Khan Aff. ¶ 12 (APP477); Hernandez Aff. ¶¶ 43-44, (APP453).
[87] Montague Depo. at 13:2-7 (APP433).  Mr. Montague had previously interacted with Ms. Holmes during his visits to the NTHCL facility in Grand Prairie.  Montague Depo. at 13:24-14:2 (APP433).
[88] Montague Depo. at 15:6-10 (APP433); Montague Depo. at 20:4-6  (APP434); Khan Aff. ¶ 12 (APP477).

As Ms. Holmes no longer had a working phone, Mr. Montague had to communicate with Mr. Dutchover to arrange the meeting.[89]  Mr. Dutchover told Mr. Montague that Ms. Holmes did not want to come to NTHCL for the meeting, and he suggested meeting at a Schlotzsky's restaurant near Ms. Holmes' residence.[90]  Mr. Montague agreed to Mr. Dutchover's suggestion, and together with Ms. Khan, travelled to the Schlotzsky's to meet with Ms. Holmes, Robin Holmes and Mr. Dutchover in the afternoon of May 5, 2014.[91]

During the meeting, Ms. Holmes admitted to the consensual nature of her affair with Mr. Hernandez.[92]  She refused, however, to provide many details.[93]  She seemed upset at the meeting, and Mr. Montague told her she could take two weeks paid leave while NTHCL investigated what had taken place.[94]

Mr. Montague had already communicated with Mr. Hernandez on May 3, 2014, after he had spoken with Mr. Dutchover.[95]  Mr. Montague instructed Mr. Hernandez to stay away from NTHCL's Grand Prairie facility while FMA conducted an investigation.[96]  Thereafter, FMA engaged an independent investigator to interview Mr. Hernandez.[97]

FMA's investigation found no evidence of sexual harassment by Mr. Hernandez.[98]  Nevertheless, FMA had lost confidence in Mr. Hernandez's judgment as a General Manager and told him he could either resign or be terminated.[99]  Mr. Hernandez resigned effective May 9, 2014,

---

[89] Montague Depo. at 16:16-23 (APP433); Montague Depo. at 20:4-6 (APP434); *see also* Dutchover Depo. at 122:8-25 (APP390).

[90] Montague Depo. at 25:7-16 (APP436); *see also* Dutchover Depo. at 128:24-129:3 (APP391-APP392). R. Holmes Depo. at 39:3-13 (APP420).

[91] Montague Depo. at 20:4-11, 20:19-24 (APP434); Khan Aff. ¶ 12 (APP477).

[92] Montague Depo. at 23:8-14 (APP435); Khan Aff. ¶ 12 (APP477); Khan Aff. Ex. 4 (APP488-APP489).

[93] *See* Khan Aff. ¶ 12 (APP477); Montague Depo. at 23:8-14 (APP435).

[94] Khan Aff. ¶ 13 (APP477); *see also* Holmes Depo. Vol. 1 at 100:22-101:7 (APP11-APP12).

[95] Hernandez Aff. ¶ 44 (APP453).

[96] Hernandez Aff. ¶ 44 (APP453); Montague Depo. at 25:7-26:5 (APP436).

[97] Montague Depo. at 16:1-15, (APP433); Montague Depo at 26:6-9 (APP436).  Prior to the allegations made by Ms. Holmes, FMA had never received any complaints of sexual harassment by any of its employees.  Foussard Depo. Vol. 1 at 17:19-24 (APP397).

[98] Khan Aff. ¶ 14 (APP477).

[99] Khan Aff. ¶ 14 (APP477); Foussard Depo. Vol. 1 at 50:3-22 (APP403).

less than one week after Mr. Dutchover had first reported the affair between Ms. Holmes and Mr. Hernandez.[100]

NTHCL informed Ms. Holmes of Mr. Hernandez's resignation in a letter of May 15, 2014.[101] NTHCL also informed Ms. Holmes that her position as a Customer Service Representative remained open to her.[102] Ms. Holmes did not, however, return to work after her two weeks of paid leave.[103] In fact, she never returned to work.[104] Nevertheless, NTHCL waited for over one year for Ms. Holmes to respond to its invitations to return to work, retaining her (and Mr. Dutchover) on its group health insurance plan the entire time, at no cost to her.[105] It was not until September 25, 2015 that NTHCL formally separated Ms. Holmes' employment and discontinued her participation in NTHCL's group health insurance plan.[106]

Ms. Holmes admits that she never reported any purported harassment by Mr. Hernandez to anyone—not even to her own mother—prior to Mr. Dutchover's contacting to Mr. Chavez and Mr. Montague on May 3, 2014.[107]

---

[100] Hernandez Aff. ¶ 44 (APP453).

[101] Holmes Depo. Vol. 1 at 78:5-23 (APP10); Holmes Depo. Vol. 1, Ex. 3 (APP42).

[102] Holmes Depo. Vol. 1, Ex. 3 (APP42).

[103] Holmes Depo. Vol 1 at 100:22-101:7 (APP11-APP12); Khan Aff. ¶¶ 15, 16 (APP477-APP478); *see also* Holmes Depo. Vol. 1 at 78:24-79:10 (APP10).

[104] *See* Holmes Depo. Vol. 1 at 72:17-23, (APP8); *see also* Foussard Depo. Vol. 1 at 67:7-25 (APP404).

[105] Holmes Depo. Vol. 1 at 101:8-102:1 (APP12); Khan Aff. ¶ 16 (APP478).

[106] Hurst Aff. ¶ 5 (APP554); Hurst Aff. Ex. 1 (APP557-APP559); *see also* Khan Aff. ¶ 16 (APP478).

[107] *See, e.g.*, Holmes Depo. Vol. 1 at 157:12-15 (APP18); Holmes Depo. Vol. 1 at 164:21-165:2 (APP19-APP20); Holmes Depo. Vol. 1 at 175:8-10 (APP21); Holmes Depo. Vol. 1 at 244:9-18, 244:14-18, (APP34); Holmes Depo. Vol. 2 at 347:23-24, 348:1-2 (APP64-APP65); Holmes Depo. Vol. 2 at 352:11-12 (APP66); *see also* R. Holmes Depo. at 82:17-83:19 (APP423). Ms. Holmes admits that she did not complain to Mr. Hernandez about his conduct that she is now attempting to characterize as "harassing." *See* Holmes Depo. Vol. 1 at 157:16-19 (APP18); Holmes Depo. Vol. 1 at 160:11-18 (APP18); Holmes Depo. Vol. 1 at 175:2-7 (APP21); Holmes Depo. Vol. 1. at 177:9-11 (APP22); Holmes Depo. Vol. 1 at 207:19-22 (APP29); *see also* Holmes Depo. Vol. 2 at 353:5-24 (APP66); Holmes Depo. Vol. 2 at 358:23-359:1 (APP67); Holmes Depo. Vol. 2 at 393:21-23, 393:394:6, 394:8-12 (APP71).

# IV.
## SUMMARY JUDGMENT STANDARD

"Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."[108]  A dispute regarding a material fact will be considered "genuine" if "the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party."[109]  As this Court has previously recognized, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving part, there is no genuine [dispute] for trial."[110]  Furthermore, "[i]f the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment *must* be granted."[111]  Similarly, if the issue is one for which the movant will bear the burden of proof at trial, and the movant "establish[es] beyond peradventure *all* of the essential elements of the claim or defense," then summary judgment is warranted."[112]

# V.
## ARGUMENT & AUTHORITIES

### A.    Ms. Holmes' Harassment and Retaliation Claims.[113]

To establish a *prima facie* case of hostile work environment sexual harassment, a plaintiff must demonstrate proof of four required elements: "(1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; [and] (4) that the harassment affected a 'term, condition, or privilege' of [her]

---

[108] *Quintana v. Fujifilm N. Am. Corp.*, 96 F. Supp. 3d 601, 609 (N.D. Tex. 2015) (citing, *inter alia*, FED. R. CIV. P. 56(a) and *Celotex v. Catrett*, 477 U.S. 317, 323-25 (1986)), *aff'd*, 628 Fed. Appx. 252 (5th Cir. 2015)).

[109] *Quintana*, 96 F. Supp. 3d at 609 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[110] *Quintana*, 96 F. Supp. 3d at 610 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)).

[111] *Quintana*, 96 F. Supp. 3d at 610 (emphasis added).

[112] *Id.* (emphasis in original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

[113] Although Plaintiff's Original Complaint [Doc. No. 1] identifies as Count One "Harassment and Retaliation," there are no allegations of retaliation in that section or elsewhere.  To the extent that the word "Retaliation" was intentionally included in Plaintiff's Original Complaint, NTHCL would ask the Court to grant summary judgment on the claim.

employment."[114]  In this case, NTHCL challenges Ms. Holmes' proof as to the second and fourth

elements.

<b>1.  <i>The conduct about which Ms. Holmes now complains was not, and could
not possibly be considered, unwelcome or uninvited.</i></b>

As the U.S. Supreme Court stated in *Meritor Savings Bank, FSB v. Vinson*, "[t]he gravamen

of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"[115]  The

term "unwelcome sexual harassment" refers to "sexual advances, requests for sexual favors, and

other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is

unsolicited or uninicted and is undesirable or offensive to the employee."[116]  As to the issue of

welcomeness, "[t]he correct inquiry is whether respondent ***by her conduct indicated*** that the

alleged sexual advances were unwelcome."[117]  Accordingly, Ms. Holmes cannot, as a matter of

law, prevail on her sexual harassment claim if, to all outward appearances at the time, she was

welcoming and enjoying the conduct about which she now complains.[118]

---

[114] *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 538 (N.D. Tex. 2005) (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)).  A fifth element, "that the employer knew or should have known of the harassment and failed to take prompt remedial action)," would be required if the alleged perpetrator of the harassment was a coworker, rather than a supervisor.  *Id.* (citing *Watts*).  At times, this Court has used the word "uninvited" interchangeably with "unwelcome" with respect to the second required element.  *See, e.g.*, *Moyer v. Jos. A. Bank Clothiers, Inc.*, Civil Action No. 3:11-CV-3076-L, 2013 WL 4434901, at *4 (N.D. Tex. Aug. 19, 2013) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)).

[115] 477 U.S. 57, 68 (1986).

[116] *Brimmer v. Shinseki*, Civil Action No. 3:11-CV-1956-L, 2013 WL 4763947, at *7 (N.D. Tex. Sept. 5, 2013) (quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)).  The term "welcome sexual harassment" is an oxymoron—if an employee "demonstrates by word or deed that the 'harassment' is welcome … it is not harassment."  *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1008-09 (7th Cir. 1994).

[117] *Meritor Savings*, 477 U.S. at 68 (emphasis added).

[118] *See, e.g.*, *Greco v. Velvet Cactus, LLC*, Civil Action No. 13-3514, 2014 WL 2943600, at *8 (E.D. La. Jun. 27, 2014) ("The Court accepts as true Greco's unsubstantiated allegation that he objected to Dickinson's advances. Nevertheless, summary judgment is appropriate because the uncontroverted evidence demonstrates that Greco's behavior failed to send a consistent signal that [Dickinson's] conduct was unwelcome.") (internal quotation marks omitted); *Ukarish v. Magnesium Elektron*, Civil Action No. 81-638, 1983 WL 593, at *5 (D.N.J. Mar. 1, 1983) (finding in favor of the defendant-employer and commenting on the fact that "outwardly Mrs. Ukarish appeared to all who were concerned and could observe her, to accept this atmosphere of sexual language and to join in it," and that such fact "conflict[ed] with the entries which she wrote in her diary," which "internal misgivings were never expressed to her coworkers and certainly not to any members of her supervision"); *see also* EEOC, Policy Guidance on Current Issues of Sexual Harassment, EEOC Notice No. 915-050 (Mar. 19, 1990), 1990 WL 1104701 at 5 n.10 ("Investigators and triers of fact rely on objective evidence, rather than subjective, uncommunicated feelings.").

The case of *Zhao v. Kaleida Health* is instructive here.[119]  In that case, the plaintiff alleged that shortly after she began working for the defendant, one of her supervisors "began a series of unwelcome sexual advances which culminated … when [he] allegedly sexually assaulted her at work."[120]  She further alleged that her sexual encounters with her supervisor "continued regularly" over the course of several months.[121]  In a motion for summary judgment, the defendant challenged the "welcomeness" element of the plaintiff's *prima facie* case.  As part of its analysis, the court considered "the voluminous e-mails sent by plaintiff to [the supervisor] … both before and after the alleged June 18, 2002 assault."[122]

The court quoted several of these e-mail messages in its opinion granting the defendant's motion, including ones in which the plaintiff had written the following: "all i want is to make us happy;" "Life is beautiful because you are here with me;" and "i want XES now !!!!!!!!"[123]  Ultimately, the court concluded that "[c]onsidering the record in its entirety … no rational trier of fact could find that plaintiff 'by her conduct indicated that the sexual advances were unwelcome.'"[124]  In the end, the plaintiff would not be allowed to pursue a claim that "fl[ew] so squarely in the teeth of [her] own prior unequivocal statements and conduct."[125]

In this case, the Court need look no further than Ms. Holmes' own words to determine that she, too, "by her conduct" indicated that her sexual relationship with was welcome.  In one e-mail message in which she described the first time she and Mr. Hernandez touched, Ms. Holmes described the welcomeness of such contact:

---

[119] No. 04-CV-467-JTC (JJM), 2008 WL 346205 (W.D.N.Y. Feb. 7, 2008).
[120] *Zhao*, 2008 WL 346205, at *2.
[121] *Id.*
[122] *Id.*, at *4.
[123] *Id.*, at *4-*5. The court noted that sometimes the plaintiff and her alleged harasser would write words backwards in their e-mails to each other. *Id.*, at *5 n.3.
[124] *Id.*, at *9 (quoting *Meritor Savings*).
[125] *Id.*

You were walking into the office for something and I backed into you. ***It ignited something in me that I have not been able to shake since that moment***. The butterflies I spoke of before, that's when I found them. I was wearing a yellow blouse, black sweater, black skirt and black heels. You softly said excuse me but I couldn't help but notice the touch of our bodies lingered for a moment longer and I was not startled as I would have been if it was someone else. Somehow I knew it was your presence so ***I welcomed and enjoyed the encounter***. I still get that feeling with every slight connection we make even if it is just a brief graze of your touch. ***Oh how I wish we could spend the day in each other's arms***. What a beautiful mess we have here.[126]

Ms. Holmes and Mr. Hernandez sent each other links to sexy and romantic songs and they made references to various song lyrics.[127]  For example, on March 12, 2014, Ms. Holmes sent a text message to Mr. Hernandez referencing the song "Gorilla" by Bruno Mars.[128]  To say this song's lyrics are explicit is putting it mildly:

> Ooh I got a body full of liquor
> With a cocaine kicker
> And I'm feeling like I'm thirty feet tall
> So lay it down, lay it down
>
> ***You got your legs up in the sky***
> ***With the devil in your eyes***
> Let me hear you say you want it all
> Say it now, say it now
>
> Look what you're doing, look what you've done
> But in this jungle you can't run
> 'Cause what I got for you
> I promise it's a killer,
> You'll be banging on my chest
> Bang bang, gorilla
>
> Ooh, yeah
> You and me baby making love like gorillas
>
> Yeah, ***I got a fistful of your hair***
> But you don't look like you're scared
> You just smile and tell me, "Daddy, it's yours."
> 'Cause you know how I like it,
> You's ***a dirty little lover***

---

[126] Holmes Depo. Vol. 2, Ex. 32 (APP91) (emphasis added).
[127] *See* Hernandez Aff. ¶ 19 (APP447); Holmes Depo. Vol. 2 at 365:23-25 (APP68).
[128] Bradberry Aff. Ex. 1 (APP544).

> If the neighbors call the cops,
> Call the sheriff, call the SWAT we don't stop,
> We keep rocking while they're knocking on our door
> ***And you're screaming, "Give it to me baby,***
> ***Give it to me motherfucker!"***
> . . . .
>
> I bet you never ever felt so good, so good
> I got your body trembling like it should, it should
> You'll never be the same baby once I'm done with you
> . . . .
>
> Ooh, yeah
> You and me baby, ***we'll be fuckin' like gorillas***
> Ooh, yeah (Yeah, yeah, baby, baby, oh yeah, yeah)
> You and me baby making love like gorillas[129]

Ms. Holmes referenced romantic songs, like "All of Me" by John Legend.[130]

Ms. Holmes did not just rely on song lyrics to express herself. She also frequently related her own sexual fantasies to Mr. Hernandez, in graphic detail. For example, she wrote in e-mail messages on March 16, 2014:

> First time ***I thought of you while pleasuring myself*** was when I stayed in Temple the first time for the transition.
> . . . .
>
> It was the first time I thought about us in detail. You knocked on my door, walked in, and started kissing me. I pulled you by your tie and you lifted my skirt. ***I was sitting on the desk when I felt you inside me.*** We made it to the bed and I was riding you. You finish...[131]

In an e-mail message on March 28, 2014, Ms. Holmes wrote:

> Then ***you flip me around by grabbing my hair and thrust all 9 inches of your rock hard cock into my wet pussy*** and instantly make me cum again. Over and over. Then I ride your cock, while you hold onto my high heels, until I make you cum.[132]

---

[129] "Gorilla" by Bruno Mars (emphasis added). The lyrics to "Gorilla" can be found at: https://play.google.com/music/preview/Tqwwnppsieffixy4lcgttvizwfy?lyrics=1&utm_source=google&utm_medium=search&utm_campaign=lyrics&pcampaignid=kp-lyrics.

[130] Holmes Depo. Vol. 2, Ex. 32 (APP92) ("I have another song for you but it is one that has a strong word in it, I am not ready to say it but I am so very scared that it will [be] sooner than later that I do."); *see also* Holmes Depo. Vol. 2, Ex. 32 (APP116) (Hernandez quoting lyrics from "All of Me": "Give you all to me, I'll give my all to you. You're my end and my beginning. Even when I lost I'm winning. 'Cause I give you all of me. And you give me all of you, oh." Holmes: "I think every verse of that song applies to us.").

[131] Holmes Depo. Vol. 2, Ex. 32 (APP130) (emphasis added).

[132] Holmes Depo. Vol. 2, Ex. 32 (APP233) (emphasis added).

In addition to describing her fantasies, Ms. Holmes repeatedly expressed to Mr. Hernandez that she wanted him, and she would tell him what she wanted him to do.  For example, in an e-mail message she sent on March 20, 2014, Ms. Holmes wrote to Mr. Hernandez:

> And *I want you*.  I am sitting in a hot bath thinking of you.  I want to play with my pussy but I know it couldn't feel even remotely close to you eating or fucking it. Damn it *I want your cock inside me morning and night.*[133]

In another e-mail message on March 24, 2014, she told him she could not get enough of him:

> I love when you have my back, and my front, and when I am sitting on you. *I like that I can feel you inside me even when I am not with you*.  Each time I think about it I can feel you hitting my spot deep inside.  You are so good and *I cant [sic] get enough*.[134]

Ms. Holmes sent a similar e-mail message on March 22, 2014, in which she told Mr. Hernandez that he was more "in tune" with her body than she was:

> I am sitting in a bubble bath right now.  I am so wet right now, and I don't mean from the water.  *I wish you were sitting behind me while I hold you [sic] cock*.  I am sliding my left hand down to my wet pussy.  Now I am gently caressing between my lips.  Mmmmmm.... *You do this much better*.  I don't know how you are so in tune with my body.  More so than me.  How do you do that?[135]

In an e-mail exchange on March 18, 2014, Mr. Hernandez described what he thought Ms. Holmes wanted, and she responded enthusiastically:

> <u>Hernandez</u>: You want me to walk in there grab you from your hair, toss you on your desk and either get on my knees to lick your pussy or fuck your brains out.

> <u>Holmes</u>: Maybe you do know me.  *I want that so bad right now*.  You are so sexy, I can't get you or your body out of my mind.[136]

Another time, Ms. Holmes expressed how good it felt to be with Mr. Hernandez and wondered when their "next trip" would be:

---

[133] Holmes Depo. Vol. 2, Ex. 32 (APP159) (emphasis added).
[134] Holmes Depo. Vol. 2, Ex. 32 (APP199) (emphasis added).
[135] Holmes Depo. Vol. 2, Ex. 32 (APP192) (emphasis added).
[136] Holmes Depo. Vol. 2, Ex. 32 (APP145) (emphasis added).

> I keep thinking about last night. *I felt so good and carefree being with you*.  All of the events leading to you fucking my brains out was a complete and total turn on. Another first for me...  All of the foreplay and intimate conversation. The elevator. The stairs.  The patio.  Oh my. . . *When is our next trip?*[137]

Ms. Holmes would write in her e-mail messages to Mr. Hernandez that she did not want their relationship to end: "I am so thankful I have found you and you have found me to bring my emotions alive.  *I love this feeling*. I don't ever want it to stop."[138]  She also told him that she was addicted to him: "I will have this memory locked away for the rest of my life.  It is such a sexy and intimate memory.  *I want more.*  I thought I was addicted before, now I don't even know how to describe it."[139]  She told him that she wanted him to be in control: "I want you to be in control, *that's what I like* ... My fantasy have *[sic]* never been very interesting, until recently.  Now it's you."[140]  Ms. Holmes also sent Mr. Hernandez photos of herself.[141]

In dozens of e-mail messages, Ms. Holmes told Mr. Hernandez that she missed him and that she wanted to be with him.[142]  She also told him repeatedly that she loved him.[143]  In response to a suggestion by Mr. Hernandez that he could avoid her, Ms. Holmes responded: "NO!  I cannot say that louder, strong *[sic]* or with more emphasis."[144]  She also responded that what scared her was "[t]he thought of this ending."[145]

The overwhelming evidence demonstrates, in Ms. Holmes's own words, that she eagerly and fervently *welcomed* Mr. Hernandez's conduct.  Ms. Holmes's "contribution to and apparent enjoyment of" the relationship, both physical and otherwise, between herself and Mr. Hernandez

---

[137] Holmes Depo. Vol. 2, Ex. 32 (APP166) (emphasis added).
[138] Holmes Depo. Vol. 2, Ex. 32 (APP119) (emphasis added).
[139] Holmes Depo. Vol. 2, Ex. 32 (APP135) (emphasis added).
[140] Holmes Depo. Vol. 2, Ex. 32 (APP84) (emphasis added).
[141] Holmes Depo. Vol. 2, Ex 32 (APP259 and APP261).
[142] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP86, APP101, APP111, APP145, APP156, APP159, APP179, APP185, APP200 and APP213).
[143] *See, e.g.*, Holmes Depo. Vol. 2, Ex. 32 (APP162, APP180, APP202-APP203, APP212, APP215, APP221, APP227, APP241, APP244, APP273 and APP276-APP277).
[144] Holmes Depo. Vol. 2, Ex. 32 (APP92).
[145] Holmes Depo. Vol. 2, Ex. 32 (APP98).

precludes any claim for sexual harassment.[146]   The undisputed evidence also illustrates that Ms. Holmes *never* complained to anyone at NTHCL or FMA about what she now refers to as "harassment" until after her boyfriend/fiancé, Mr. Dutchover, discovered her affair and confronted her over it.[147]

A rational trier of fact can be left with only one conclusion—Ms. Holmes manifested nothing but "enthusiastic receptiveness" to those actions she now attempts to characterize as "harassment."[148]   In the face of these unassailable facts, there is simply no way for Ms. Holmes to meet the required proof for the second element of her sexual harassment claim, and NTHCL is entitled to summary judgment on this basis.[149]

> **2.    Ms. Holmes cannot demonstrate that the purported "harassment" affected a term, condition, or privilege of her employment.**

To support a claim of sexual harassment, the challenged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile [or] abusive, and subjectively offensive, meaning that the victim perceived it to be so."[150]   Moreover, as this Court has previously recognized, "[e]ven when a hostile environment is shown, the plaintiff must establish that the

---

[146] *See Loftin-Boggs v. City of Meridian, Miss.*, 633 F.Supp. 1323, 1327 (S.D. Miss. 1986), *aff'd*, 824 F.2d 971, *cert. denied*, 484 U.S. 1063 (1988); *cf. Dye v. BNSF Ry. Co.*, CV-14-150-BLG-CSO, 2016 WL 492755, at *6 (D. Mont. Feb. 8, 2016) (applying federal law principles to a claim for *quid pro quo* sexual harassment made under Montana law similar to Title VII: "The Court concludes, however, that Dye has failed to present evidence from which a reasonable juror could conclude that Greer's sexual advances were 'unwelcome.' Rather, evidence of Dye's own conduct indicates that she not only welcomed Greer's sexual advances, but also sought them out and encouraged them.").

[147] *See, e.g.*, Holmes Depo. Vol. 1 at 164:21-165:2 (APP19-APP20); Holmes Depo. Vol. 1 at 244:9-12, 244:14-18 (APP34).

[148] *See Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1011 (7th Cir. 1994).

[149] This is true even if Ms. Holmes, in fact, did internally "object" to Mr. Hernandez's conduct *at the time*, a fact which is far from clear.  According to Ms. Holmes' own testimony, she "*learned* from [her] therapist" that her relationship with Mr. Hernandez "was not" consensual.  Holmes Depo. Vol. 1 at 252:20-253:6 (APP35-APP36) (emphasis added).  If Ms. Holmes had to "learn" after the fact that her relationship with Mr. Hernandez was not, in fact, "consensual," that would mean that at the time the relationship was ongoing, even she believed it to be consensual.  Also, Ms. Holmes testified that she has not "mentally been in a good place since ***May of 2014*.**"  Holmes Depo. Vol. 3 at 564:9-15 (APP384).  In other words, Ms. Holmes' "distress" is tied to Mr. Dutchover learning of her relationship with Mr. Hernandez and the confrontation that ensued, not the prior weeks and months of purported "harassment" by Mr. Hernandez.  *See* R. Holmes Depo. at 121:10-122:25 (APP427) (describing the change in Ms. Holmes' behavior after her engagement to Mr. Dutchover had been called off).

[150] *Moyer v. Jos. A. Bank Clothiers, Inc.*, Civil Action No. 3:11-CV-3076-L, 2013 WL 4434901, at *4 (N.D. Tex. Aug. 19, 2013) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)).

workplace environment had the affect of altering the terms and conditions of her employment."[151]

In this regard, it is "[c]entral to the court's inquiry … whether the alleged harasser's actions have

undermined the victim's workplace competence, discouraged her from remaining on the job, or

kept her from advancing in her career."[152]   In other words, "Title VII is intended only to prohibit

and prevent conduct that is so severe [or] pervasive that it *destroys a protected class member's*

*opportunity to succeed in the workplace.*"[153]

In this case, Ms. Holmes can present no evidence that Mr. Hernandez's alleged conduct

"destroy[ed] [her] opportunity to succeed in the workplace" at NTHCL.   First, as demonstrated

above, Ms. Holmes cannot establish that she actually perceived Mr. Hernandez's conduct toward

her to be "hostile" or "abusive."[154]   Rather, she welcomed Mr. Hernandez's conduct with great

enthusiasm.   Second, Ms. Holmes has no evidence to suggest that she was unable to do her job as

a result of any conduct by Mr. Hernandez.[155]   The undisputed evidence is that she was performing

her job quite well, right up until May 3, 2014, when her boyfriend reported to Mr. Montague that

---

[151] *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 538 (N.D. Tex. 2005).

[152] *Walker*, 375 F. Supp. 2d at 538.

[153] *Walker*, 375 F. Supp. 2d at 538 (emphasis added and internal quotation marks omitted); *see also Moyer* 2013 WL 4434901, at *11 (N.D. Tex. Aug. 19, 2013) ("Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, *but does not hinder an employee's performance.*") (emphasis added).

[154] *Cf. Piccone v. Town of Webster*, No. 09-CV-6266 (MAT), 2011 WL 3322550, at *14 (W.D.N.Y. Aug. 2, 2011) (considering a hostile work environment claim under New York law to which Title VII standards apply: "Plaintiff admitted that she might have initiated one of the allegedly offensive email exchanges.   This seriously calls into question Plaintiff's contention that she subjectively perceived conduct as abusive, which is a requirement to finding the conduct actionable.").

[155] *See Moyer*, 2013 WL 4434901, at *12 (finding it significant that the plaintiff "was nonetheless able to perform her job" and was "a good employee and met all of her job requirements"); *Davis v. Wal-Mart Stores, Inc.*, Civil Action No. 3:05-CV-1805-L, 2007 WL 836860, at *9 (N.D. Tex. Mar. 19, 2007) ("Plaintiff has failed to submit evidence that the alleged conduct unreasonably interfered with her work performance."); *Lacher v. Principi*, No. Civ A. 3:99-CV-2937L, 2002 WL 1033089, at *5 (N.D. Tex. May 20, 2002) (considering a claim of age discrimination and concluding that "the evidence did not demonstrate that the harassment interfered with [the plaintiff's] workplace performance"); *Kenyon v. Western Extrusions Corp.*, No. Civ.A. 3:98CV2431L, 2000 WL 12902, at *6 (N.D. Tex. Jan. 6, 2000) ("While the court agrees that the conduct is offensive and despicable, Kenyon has produced no evidence showing that she failed to perform her job, was discouraged from continuing to work for Western and sought employment elsewhere, or failed to advance in her career as a result of the harassment.").

she had been having an affair with Mr. Hernandez.[156]   Furthermore, it is undisputed that

Ms. Holmes never reported any "offensive" conduct.[157]   Accordingly, Ms. Holmes' sexual

harassment claim also fails based on her inability to establish the fourth element of her required

*prima facie* proof.

### 3.   NTHCL is entitled to summary judgment on its Ellerth/Faragher affirmative defense.

Notwithstanding Ms. Holmes' failure to establish a *prima facie* case of sexual harassment,

NTHCL is nevertheless entitled to summary judgment here based on the *Ellerth/Faragher*

affirmative defense.  This defense is comprised of two elements: "(1) the employer exercised

reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the

plaintiff employee unreasonably failed to take advantage of any available preventative or

corrective opportunities."[158]

In this case, it is undisputed that NTHCL had in place a clear "Policy Against

Harassment."[159]   Under this policy, any NTHCL employee who felt that he/she was experiencing

unwelcome sexual harassment was required to report such harassment to NTHCL management.[160]

It is also undisputed that, until May 3, 2014, Ms. Holmes *never* reported any complaint of sexual

harassment to anyone at NTHCL.[161]   When Ms. Holmes finally did come forward, after her

boyfriend/fiancé had reported the affair between her and Mr. Hernandez to FMA, FMA acted

---

[156] *See* Holmes Depo. Vol. 1 at 127:12-13, 16-18, 128:1-4 (APP14); Holmes Depo. Vol. 1 at 189:22-190:6 (APP25); Montague Depo. at 14:13-17 (APP433); Khan Aff. ¶ 11 (APP477); Hernandez Aff. ¶ 9 (APP445).

[157] *See Moyer*, 2013 WL 4434901, at *12 (determining that the conduct of which the plaintiff was complaining "was not sufficiently severe or pervasive enough to affect the terms or conditions of Moyer's employment, as it was not significant enough to cause her to complain about it … or report it"); *Lacher*, 2002 WL 1033089, at *5 (placing significance on the fact that the plaintiff "did not mention any of the complained of conduct to Crahan or Loman, even when these supervisors conducted their inspections of the store and had the opportunity to speak privately with him").

[158] *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 538 (N.D. Tex. 2005) (citing, *inter alia*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765(1998)).

[159] Holmes Depo. Vol. 1, Ex. 8 (APP44-APP45).

[160] Holmes Depo. Vol. 1, Ex. 8 (APP44-APP45).

[161] *See, e.g.*, Holmes Depo. Vol. 1 at 164:21-165:2 (APP19-APP20); Holmes Depo. Vol. 1 at 244:9-12, 244:14-18 (APP34).

immediately by (1) instructing Mr. Hernandez to stay away from the NTHCL facility pending an investigation, (2) setting up a meeting with Ms. Holmes on the first business day following the report, and (3) requiring Mr. Hernandez's resignation less than a week after first being made aware of the affair.[162]

As set forth above, it is more than apparent from the surfeit of Ms. Holmes' own communications that she did not view Mr. Hernandez's conduct as unwelcome or "harassing" at the time the relationship was taking place. However, had Ms. Holmes reported any purportedly "harassing" conduct sooner, NTHCL and FMA could have acted sooner. She did not do so, despite being on notice, by virtue of the NTHCL Employee Handbook, that NTHCL did not tolerate sexual harassment and demanded that employees report any sexual harassment they were experiencing.

There can be no dispute that once NTHCL and FMA were put on notice of the relationship between Ms. Holmes and Mr. Hernandez, they acted swiftly and decisively. Undoubtedly, Mr. Hernandez could not have gone on "harassing" Ms. Holmes, because he was no longer employed by NTHCL.[163] Accordingly, NTHCL is entitled to summary judgment in its favor based on its *Ellerth/Faragher* defense.

### B.     Ms. Holmes' Intentional Infliction of Emotional Distress Claim.

As this Court has previously recognized, "the Texas Supreme Court has repeatedly emphasized that the tort of intentional infliction of emotional distress is a 'gap-filler' tort and may not be maintained as a separate claim unless 'the victim has no other recognized theory of redress.'"[164] Under these facts of this case, the gravamen of Ms. Holmes' complaint is for sexual harassment under Title VII. "[W]hen a statutory scheme makes available a remedy for essentially

---

[162] *See* Montague Depo. at 25:24-26:5 (APP436); Hernandez Aff. ¶ 44 (APP453); Khan Aff. ¶ 12 (APP477).
[163] *Compare Walker*, 375 F. Supp. 2d at 543 (discussing the defendant's failure to investigate after the plaintiff made reports of racial discrimination).
[164] *Moyer v. Jos. A. Bank Clothiers, Inc.*, Civil Action No. 3:11-CV-3076-L, 2013 WL 4434901, at *7 (N.D. Tex. Aug. 19, 2013) (quoting *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004)).

the same conduct as would the common law tort, there is no gap to fill."[165]  Accordingly, as this Court has previously held, Ms. Holmes "must proceed solely under her statutory claim unless she can adduce *additional facts, unrelated to sexual harassment* to support an independent tort claim for intentional infliction of emotional distress."[166]  Ms. Holmes can present no evidence of any such "additional facts."  Therefore, her intentional infliction of emotional distress claim must fail, and NTHCL is entitled to summary judgment in its favor on this claim.

### C.      Ms. Holmes' Negligence and Gross Negligence Claims.

Ms. Holmes' claims for negligence and gross negligence are based, in part, on her allegation that NTHCL "negligently hir[ed] and supervis[ed] David Hernandez."[167]  This Court has previously found such negligence claims to be preempted by Title VII.[168]

Ms. Holmes also alleges certain other acts of purported "negligence" by NTHCL, such as "[f]ailing to maintain and distribute a sexual harassment policy" and "[f]ailing to maintain and distribute an internal complaint procedure."[169]  Ms. Holmes can offer no evidence to support these claims, as is it undisputed that NTHCL had a clear "Policy Against Harassment" in its Employee Handbook, and Ms. Holmes was provided a copy of the Employee Handbook.[170]

With respect to the other acts of purported "negligence" alleged by Ms. Holmes, to the extent they do not fall under the heading of the preempted claims of negligent hiring and/or negligent supervision, they still must fail.[171]  Ms. Holmes can provide no evidence that (1) NTHCL

---

[165] *Moyer*, 2013 WL 4434901, at *16 (internal quotation marks omitted).

[166] *See Moyer*, 2013 WL 4434901, at *16 (emphasis added).

[167] *See* Plaintiff's Original Complaint [Doc. No. 1] at 10.

[168] *See Moyer*, 2013 WL 4434901, at *17.

[169] *See* Plaintiff's Original Complaint [Doc. No. 1] at 10.

[170] *See* Holmes Depo. Vol. 1 at 129:25-130:9, 132:9-11, (APP15); Holmes Depo. Vol. 1, Ex. 8 (APP44-APP45); Holmes Depo. Vol. 1, Ex. 9 (APP46).

[171] For example, Ms. Holmes identifies "[f]ailing to terminate David Hernandez," "[f]ailing to eliminate a workplace environment where sexual harassment was tolerated," and "[f]ailing to monitor text use of David Hernandez." Plaintiff's Original Complaint [Doc. No. 1] at 10. These would all appear to be merely more specifically defined instances of Ms. Holmes' more general claim for "negligent supervision."

had a duty to act any differently with respect to the "negligent" acts of which she complains, (2) NTHCL breached any such duty, or (3) any "breach" by NTHCL proximately caused her purported damages.

For all of these reasons, NTHCL is entitled to summary judgment on Ms. Holmes' negligence and gross negligence claims.

### D.     Ms. Holmes' Assault and Battery Claims.

"As a general rule in Texas, an employer cannot be vicariously liable for the intentional torts of assault or battery perpetrated by its employee because such acts are not ordinarily within the course and scope of an employee's authority or employment."[172]   Rather, conduct amounting to assault and/or battery "is considered an expression of personal animosity and not for the purpose of carrying out a[n employer's] business."[173]   Thus, in order to hold NTHCL liable for the purported torts of Mr. Hernandez, Ms. Holmes must present evidence of the following with respect to his alleged acts that she claims constitute "assault" or "battery": (1) Mr. Hernandez was acting within the general authority granted to him by NTHCL; (2) he was acting in furtherance of NTHCL's business; and (3) he was acting for the accomplishment of an object for which he was employed by NTHCL.[174]

Ms. Holmes cannot offer proof of any of the three elements set forth above.   There is simply no evidence suggesting that, in engaging in his affair with Ms. Holmes, Mr. Hernandez was acting within the general authority granted to him by NTHCL.   On the contrary, NTHCL's Employee Handbook expressly warns that "[s]exual harassment is strictly prohibited."[175]   Moreover, there is

---

[172] *Thawar v. 7-Eleven, Inc.*, 165 F. Supp. 3d 524, 530 (N.D. Tex. 2016) (quoting *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 493 (Tex. App.—Fort Worth 2002, no pet.)).
[173] *Thawar*, 165 F. Supp. 3d at 530 (quoting *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 453 (Tex. App.—Tyler 1996, no writ)).
[174] *See Thawar*, 165 F. Supp. 3d at 530.
[175] Holmes Depo. Vol. 1, Ex. 8 (APP44), *see also* Khan Aff. ¶ 3 (APP475).

no reasonable explanation for how Mr. Hernandez's conducting himself in a sexual relationship with Ms. Holmes could possibly be in furtherance of NTHCL's business.  Similarly, no object for which Mr. Hernandez was employed by NTHCL was accomplished by virtue of his affair with Ms. Holmes.

Finally, Ms. Holmes' purported battery claim is based on her allegation that Mr. Hernandez "touched and molested [her] in a harmful *and offensive* manner."[176]  As set forth in detail above, Ms. Holmes repeatedly communicated to Mr. Hernandez that his contact with her was anything but "offensive."  For example, in an e-mail message on April 25, 2014, Ms. Holmes wrote the following to Mr. Hernandez:

> I have missed you and our intimate conversations **and touches**. It's not the same thing trying to fit it in before work. It's so rushed.  **I want to spend time with you and tease you and you tease me**.  I never realized how much foreplay increased a sexual encounter.  You are teaching me so many things!
>
> I wont [sic] be able to communicate this weekend, **but you will be in my thoughts**.  I hope you have a wonderful, stress free, sexy, relaxing, weekend.  Think about me tons because I will be thinking of you just as much.
>
> Don't Forget,
> xoxo[177]

Based on the numerous communications Ms. Holmes wrote to Mr. Hernandez like the one above, she cannot establish that *any* battery occurred, much less any battery that can be attributed to NTHCL.  The result would be the same for any purported "assault."

For all of these reasons, NTHCL is entitled to summary judgment on Ms. Holmes' assault and battery claims.

---

[176] Plaintiff's Original Complaint [Doc. No. 1] at 11 (emphasis added).
[177] Holmes Depo. Vol. 2, Ex. 32 (APP368) (emphasis added).

### E.   Ms. Holmes' Claim for Negligent Investigation.

Under the heading of her purported "Negligent Investigation" cause of action, Ms. Holmes asserts that NTHCL "negligently investigat[ed] Plaintiff's complaints."[178] Ms. Holmes also claims she was "[c]onstructively fir[ed] … due to an inadequate investigation."[179] These assertions are factually inaccurate and simply illogical.

First, Ms. Holmes offers no explanation as to how NTHCL "negligently" investigated her complaints against Mr. Hernandez once FMA actually learned of the relationship on May 3, 2014. It is undisputed that FMA acted immediately after learning of the affair.  The first business day following his telephone conversations with Mr. Dutchover, Ms. Holmes and Mr. Hernandez about the relationship, Mr. Montague, a principal of FMA, and Ms. Khan, NTHCL's Human Resources Manager, met with Ms. Holmes in person.[180] Mr. Montague instructed Mr. Hernandez to stay away from NTHCL's Grand Prairie facility while FMA conducted an investigation.[181] Later that same week, FMA required Mr. Hernandez to resign, thus removing Ms. Holmes' purported "harasser" from her place of employment.[182]

Ms. Holmes could not have been "constructively fir[ed]."  The undisputed evidence shows that NTHCL provided her with two weeks of paid leave, and then she simply never returned to work.[183] Furthermore, NTHCL continued to carry both Ms. Holmes and Mr. Dutchover on its group health insurance plan at no cost to them *for 17 months*.[184] NTHCL could not have been more accommodating to Ms. Holmes under the circumstances.

---

[178] Plaintiff's Original Complaint [Doc. No. 1] at 13.
[179] *Id.*
[180] *See* Khan Aff. ¶ 12 (APP477); *see also* R. Holmes Depo. at 120:17-121:2 (APP426-APP427).
[181] Hernandez Aff. ¶ 44 (APP453); Montague Depo. at 25:7-26:5 (APP436).
[182] Hernandez Aff. ¶ 44 (APP453); *see also* Foussard Depo. at 50:3-22 (APP403).
[183] Holmes Depo. Vol. 2 at 384:3-6 (APP69); Khan Aff. ¶¶ 13, 15-16 (APP477-APP478).
[184] Holmes Depo. Vol. 1 at 100:22-102:1 (APP11-APP12); Khan Aff. ¶ 16 (APP478).

For these reasons, Ms. Holmes' purported claim for "Negligent Investigation" is without merit, and NTHCL is entitled to summary judgment on this claim.

## VI.
## PRAYER

WHEREFORE, NTHCL respectfully requests that, for the reasons set forth above, the Court grant its motion for summary judgment.

## VII.
## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule II.B of the Court's Judge Specific Requirements, NTHCL respectfully requests the Court to set oral argument on NTHCL's motion for summary judgment.

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142


By:   *Monte K. Hurst*
      Monte K. Hurst
      State Bar No. 00796802
      Monte.Hurst@hallettperrin.com

      Jennifer R. Poe
      State Bar No. 00794470
      JPoe@hallettperrin.com

      *Counsel for Defendant North Texas Health Care Laundry Cooperative Association, d/b/a North Texas Health Care Laundry*

## CERTIFICATE OF SERVICE

On November 18, 2016, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served Plaintiff's counsel as follows electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Jay C. English
ENGLISH LAW GROUP, PLLC
7616 LBJ Freeway, Suite 401
Dallas, Texas 75251
JEnglish@englishpllc.com

Mr. J. Scott Perry
ENGLISH LAW GROUP, PLLC
7616 LBJ Freeway, Suite 401
Dallas, Texas 75251
SPerry@englishpllc.com


*Monte K. Hurst*
Monte K. Hurst