IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHRISTINA HOLMES, §
§
Plaintiff, §
§
v. § Civil Action No. 3:15-CV-2117-L
§
NORTH TEXAS HEALTH CARE §
LAUNDRY COOPERATIVE §
ASSOCIATION, d/b/a NORTH TEXAS §
HEALTH CARE LAUNDRY, §
§
Defendant. §

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment (Doc. 72), filed November 18, 2016. After careful consideration of the motion, response, reply, appendixes, record, and applicable law, the court **grants** Defendant's Motion for Summary Judgment (Doc. 72).

## I. Factual and Procedural Background

This case arises out of the employment of Plaintiff Christina Holmes ("Plaintiff" or "Holmes") by Defendant North Texas Health Care Laundry Cooperative Association, d/b/a North Texas Health Care Laundry ("NTHCL" or "Defendant"). Holmes alleges that shortly after she began working at NTHCL she was subjected to unwelcome sexual advances by David Hernandez ("Hernandez"), NTHCL's general manager, culminating in numerous sexual encounters over the course of several months. Holmes commenced this action on June 23, 2015, asserting federal claims against NTHCL for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), as well as state law claims of negligence, intentional infliction of emotional distress, battery, assault, gross negligence, and negligent

investigation. She seeks compensatory and exemplary damages, as well as prejudgment and postjudgment interest, attorney's fees, and costs. NTHCL has filed a motion for summary judgment, contending that no genuine disputes of material fact exist with respect to Holmes's asserted claims, and that it is, therefore, entitled to entry of judgment as a matter of law. NTHCL also seeks summary judgment on its *Ellerth/Faragher*[1] affirmative defense with respect to Holmes's Title VII claims. The court now sets forth the facts upon which it relies to resolve the summary judgment motion. In setting forth the facts, the court applies the summary judgment standard as set forth in the following section. The facts are undisputed, unless otherwise noted.

NTHCL is a specialty laundry service based in Grand Prairie, Texas, and provides clean linens to numerous hospitals and clinics in Texas. Foussard Montague Associates, Inc. ("FMA"), NTHCL's management company, provides it with a general manager to work out of its Grand Prairie facility. At all relevant times, Hernandez held the general manager position at NTHCL and was responsible for the day-to-day operations of the facility.

On July 15, 2013, NTHCL hired Holmes to work as a customer service representative. On her first day, Holmes met with Mary Khan ("Khan"), NTHCL's human resources manager, to review and complete her employee paperwork and review safety videos. As part of her orientation that day, Holmes received a copy of NTHCL's Employee Handbook "outlin[ing] the policies and work rules of the company and [her] responsibilities as an employee." Def.'s Summ. J. App. 46. Together, Holmes and Khan reviewed portions of the Employee Handbook. Holmes also signed an

---

[1] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).

acknowledgment page confirming that she received the Employee Notebook and would read it. *Id.* at 46.[2] The Employee Handbook contains a "Policy Against Harassment," which provides:

> North Texas Health Care Laundry Cooperative Association is committed to providing a work place that is free of unlawful discrimination based on race, color, religion, national origin, sex, disability, age or citizenship. Unlawful harassment, including that of a sexual nature, is also prohibited. Sexual harassment is strictly prohibited. Unwelcome sexual advances, requests for sexual favor, and other verbal or physical conduct of a sexual nature constitute[] sexual harassment when submission to such conduct is either explicitly or implicitly made a condition of employment, used as a basis for employment decisions, or has the purpose or effect of unreasonably interfering with work performance or creates a hostile atmosphere.
>
> Employment means anything that affects the employment relationship. Examples include promotions, disciplinary actions and work assignments. Sexual harassment also includes, but is not limited to, unsolicited and unwelcome sexually related comments or jokes, touching, art work, magazines or calendars. If you believe you have been sexually harassed, you are expected to report it promptly to your manager or supervisor or General Manager.

---

[2] Although Holmes testified at her deposition that she received a copy of NTHCL's Employee Handbook containing the "Policy Against Harassment," and she signed an acknowledgment that she received a copy and would read it (*see* Def.'s Summ. J. App. 15-16, 46), in her Affidavit filed with her summary judgment response brief, she states she did not receive a copy of anything she signed, implying she did not receive a copy of the Employee Handbook containing the "Policy Against Harassment." *See* Pl.'s Summ. J. App. 110 ("When I was hired, I was rushed through a series of papers to sign. I was not given copies of anything I signed."). Invoking the "sham-affidavit" doctrine, NTHCL objects to these statements, arguing they are inconsistent with Holmes's sworn deposition testimony and, therefore, should not be considered by the court in evaluating whether Holmes has raised a genuine dispute of material fact sufficient to defeat summary judgment. *See* Def.'s Reply Br. 12 n.18 (Doc. 79) ("Ms. Holmes cannot create a fact issue through affidavit testimony that directly contradicts her prior deposition testimony.") (citations omitted). The court **sustains** this objection. Under the "sham affidavit" doctrine, a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit [that] contradicts, without explanation, [her] previous testimony." *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2011); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996). The court has scrutinized Holmes's statements in her Affidavit and her prior sworn deposition testimony, and finds that her affidavit testimony that she did not receive copies of what she signed contradicts her previous sworn deposition testimony acknowledging that she received the Employee Handbook containing the "Policy Against Harassment," as evidenced by her signature confirming receipt. Def.'s Summ. J. App. 15. Holmes offers no explanation for the conflicting testimony set out in her Affidavit. Accordingly, the court will not consider Holmes's statement in her Affidavit that she did not receive a copy of anything she signed in addressing NTHCL's Motion for Summary Judgment.

> An investigation will follow.  Any warranted corrective action will be taken.
> Retaliation against any employee who has reported a sexual harassment complaint
> is strictly prohibited.

*Id.* at 44-45.

Initially, Holmes was supervised by Jake McCuiston ("McCuiston"), NTHCL's Customer Service Manager.  In or around September 2013, McCuiston found another job and tendered his resignation.  FMA made the decision to transfer another NTHCL employee, Will Chavez ("Chavez"), into the Customer Service Manager position, and he became Holmes's direct supervisor.

In or around October 2013, Holmes and Hernandez began exchanging text and e-mail messages of an informal nature using their work e-mail accounts.  Beginning in March 2014, e-mail and text messages became more frequent and more personal.  On March 12, 2014, for example, Holmes sent Hernandez a text message containing a link to "Gorilla," a sexually graphic song by Bruno Mars.  *Id.* at 544.[3]  Holmes also referenced romantic songs in her communications with Hernandez, such as "All of Me" by John Legend,[4] stating her belief that "every verse of that song applies to us."  *Id.* at 116.

At around this time, Holmes and Hernandez began to use private g-mail accounts to communicate with each other, rather than their work e-mails.  Holmes created her own g-mail account under the name "missevasive1@gmail.com," which she only used for purposes of communicating with Hernandez.  *Id.* at 5.  On March 13, 2014, Holmes sent a g-mail message to Hernandez at his g-mail address, "dalyd72@gmail.com," stating "I am incredibly attracted to you.

---

[3] *See* http://www.metrolyrics.com/gorilla-lyrics-bruno-mars.html.

[4] *See* http://www.metrolyrics.com/all-of-me-lyrics-john-legend.html.

I don't know what it is. I feel safe when I am around you but you also make me feel sexy. I haven't

felt that way, ever." *Id.* at 56.

After this e-mail, Holmes and Hernandez exchanged hundreds of e-mails, many of which

were sexually graphic and lascivious in nature, many initiated by Holmes, others initiated by

Hernandez, and many in which Holmes stated that she missed Hernandez, wanted to be with him,

and loved him. *See id.* at 70, 81-381. Among the hundreds of e-mails are the following excerpts

authored by Holmes and sent to Hernandez:

> • March 13, 2014
>
> I look forward to each morning that I get to see you and don't want this time with you
> to end. You have turned me into a teenager again, and I am all giddy and happy now.
> I try not to show it because I don't want anyone to suspect anything, but it is oh so
> hard to contain my feelings. My favorite is doggy style. I want you to be in control,
> that's what I like. I am not a big fan of oral, has to do with my messed up head (part
> of my story that has yet to be told). My fantasy have [sic] never been very
> interesting, until recently. Now it's you.

*Id.* at 84.

> • March 16, 2014:
>
> First time I thought of you while pleasuring myself was when I stayed in Temple the
> first time for the transition.
> . . . .
>
> It was the first time I thought about us in detail. You knocked on my door, walked
> in, and started kissing me. I pulled you by your tie and you lifted my skirt. I was
> sitting on the desk when I felt you inside me. We made it to the bed and I was riding
> you. You finish...

*Id.* at 130.

> • March 20, 2014:
>
> And I want you. I am sitting in a hot bath thinking of you. I want to play with my
> p***y but I know it couldn't feel even remotely close to you eating or f**king it.
> Damn it I want your c**k inside me morning and night.

*Id.* at 159.

    • March 22, 2014:

I am sitting in a bubble bath right now. I am so wet right now, and I don't mean from the water. I wish you were sitting behind me while I hold you [sic] c\*\*k. I am sliding my left hand down to my wet p\*\*\*y. Now I am gently caressing between my lips. Mmmmmm.... You do this much better. I don't know how you are so in tune with my body. More so than me. How do you do that?

*Id.* at 192.

    • March 24, 2014:

I love when you have my back, and my front, and when I am sitting on you. I like that I can feel you inside me even when I am not with you. Each time I think about it I can feel you hitting my spot deep inside. You are so good and I cant [sic] get enough.

*Id.* at 199.

    • March 28, 2014:

Then you flip me around by grabbing my hair and thrust all 9 inches of your rock hard c\*\*k into my wet p\*\*\*y and instantly make me cum again. Over and over. Then I ride your c\*\*k, while you hold onto my high heels, until I make you cum.

*Id.* at 233. These e-mails are just examples of the voluminous e-mails exchanged by Holmes and Hernandez between March 2014 and the beginning of May 2014, that are sexually graphic.

Holmes also sent e-mail messages to Hernandez stating that she did not want their relationship to end. For example, she e-mailed him and said: "I am so thankful I have found you and you have found me to bring my emotions alive. I love this feeling. I don't ever want it to stop[]"; and "I will have this memory locked away for the rest of my life. It is such a sexy and intimate memory. I want more. I thought I was addicted before, now I don't even know how to describe it[.]" *Id.* at 84, 119, 135, 166. Holmes also sent Hernandez photos of herself. *Id.* at 259, 261.

In addition to these e-mails, Holmes informed Hernandez in many other e-mails that she missed him, wanted to be with him, and loved him. *Id.* at 86, 101, 111, 145, 156, 159, 162, 179, 180, 185, 200-03, 212-13, 215, 221, 227, 241, 244, 273, 276-77. Some examples are the following e-mails sent by Holmes to Hernandez:

• March 15, 2014

When he [sic] is gone, I am checking this email like crazy! I can't wait to see you [sic] have to say. I can't wait for any and every opportunity to communicate and think about you.

*Id.* at 107.

• March 16, 2014

I cherish every minute I have with you and I don't want it to end.

*Id.* at 116.

• March 19, 2014

I would live [sic] to be able to run into your arms every night. I would be the happiest girl in the world . . . I can't wait to see you tonight, until then You will be on my mind. XXX . . . I cherish every second I have with you.

*Id.* at 154.

• March 20, 2014

I do miss you. Like I told you earlier, I miss you so much it hurts. I miss the adoring way you look at me. I miss your touch. I miss your arms and scars. I miss your conversation, I miss <u>you</u>. I am head over heels into you and it's such a good feeling and scary at the same time. It's scary because I know my feelings are only going to intensify and I know I can't have you all the time . . . I miss you baby. I dot [sic] like this feeling when I'm not with you.

*Id.* at 167-68 (original emphasis).

• March 31, 2014

I am thinking I want to crawl under your desk. I want to steal you away and never return you. I want to wrap myself in your arms and never leave.

*Id.* at 252.

• April 3, 2014

I keep telling you I am fluent in the language of David. I love you baby, and I know that what we have is totally fu**ed up but I want to see where it goes. It might last forever. It might not, but we are just going to enjoy the ride. Remember.

*Id.* at 277.

• April 6, 2014

The pieces of me are starting to crumble. I don't know how much longer I can take not hearing from you. Just something. Anything.

* * *

I don't know what to do. I can't get any response from you. You are all I want. I don't know what the hell is going on. I want to call you. I want to see you. I want to touch you. I want to kiss you. I want to hold you. I don't know what to do with myself . . . . . [sic] I feel much better since we talked. Gary is home now so I can't talk, but I will see you in the morning. I LOVE YOU BABY!

*Id.* at 296.

• April 9, 2014

I want to be in your arms. I can feel the distance between us today, don't like it. I like when we start our mornings together, my day is always a good one when that happens.

*Id.* at 313. Holmes also stated in an e-mail that it scared her to think of what they had ending. *Id.*

at 98.[5]

_____

[5] Holmes objects to the admissibility of these e-mails, arguing that they are "unauthenticated under Rule 901 of the Federal Rules of Evidence" and include "hearsay" in violation of Rule 801 of the Federal Rules of Evidence. *See* Pl.'s Obj. to Def.'s Summ. J. Evid. 3 (Doc. 76-3). The court **overrules** her objections. As an initial matter, Holmes fails to specify which statements in the record are unauthenticated or contain inadmissible hearsay but merely lodges a general objection to all the e-mails contained in pages

Hernandez similarly sent voluminous e-mails to Holmes during the same time period, many containing playful banter and stating he was attracted to her, and many that were sexually graphic or described sexual fantasies and sexual acts he wanted to perform with her or had performed with her. *See generally id.* at 81-381. For example, after receiving the link Hernandez sent him to Bruno Mars's sexually graphic song titled "Gorilla," *see supra* note 3, Hernandez e-mailed Holmes stating: "I just listened to the Gorilla song. I still find that song very sexy . . . like you." *Id.* at 92. As part of the same e-mail chain, he later stated: "I can't wait to see what fate has in store for us. Do you like it when I kiss you?" *Id.* at 94. On March 16, 2014 , Hernandez sent Holmes a series of e-mails answering certain questions she had posed to him in a prior e-mail:

---

78-381 of NTHCL's appendix. The court is not under a duty to parse through the evidence, determine which evidence forms the basis of Holmes's objection, and consider and rule on the objection. For this reason alone, the court overrules Holmes's objection. In any event, the e-mails are properly authenticated and are not hearsay. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims." Fed. R. Evid. 901(a). E-mails and other electronic records are authenticated under Federal Rule of Evidence 901(b)(4), under which evidence may be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Pages 78-381 of NTHCL's appendix are comprised of printouts of e-mail messages exchanged between Holmes and Hernandez, using their g-mail accounts, between mid-March 2014 and early May 2014. Each message indicates the sender, recipient, and date and time of transmission. Further, Holmes does not dispute NTHCL's contention that most of these e-mail messages were initially produced by her counsel to NTHCL's counsel in June 2014, and again during the litigation in response to NTHCL's discovery requests. In addition, at her deposition, while Holmes stated she did not recall certain e-mail exchanges, she did not deny the conversations took place or that the e-mail messages to which she now objects were what they purported to be. *See* Def.'s Summ. J. App. 32, 66, 69-70, 79, 81-82. With respect to Holmes's objection that the e-mails are inadmissible hearsay, the court concludes that the e-mail printouts are excluded from the hearsay rule under Federal Rule of Evidence 801(d)(2)(A), as they are statements made by Holmes, a party opponent. *See* Fed. R. Evid. 801(d)(2)(A) (excluding from the definition of hearsay an admission offered against an opposing party that "was made by the party in an individual or representative capacity[.]"). Alternatively, the statements contained in the e-mails are not hearsay because they are not offered for the truth of the matter asserted (*e.g.,* that Holmes, in fact, entertained sexual fantasies about Hernandez in the bathtub), but to show that the alleged sexual harassment was not unwelcome. *See* Fed. R. Evid. 801(c)(2) (An out-of court statement is hearsay when it is "offered in evidence to prove the truth of the matter asserted in the statement.").

> Ok my angel here goes the rest. [Y]our 5th question was what was my favorite position? I am very passionate when it comes to making love. l wasn't [sic] to see and feel everything. When l walk away l want to remember every little moment. l guess I would consider myself a position changer .... I do not like one position because during one sexual encounter you must be in several positions. I don't have a favorite[.] I guess the one that makes you cum the best is my favorite position. If I had to choose I would say that any position where I can hold you tightly and be able to see your eyes are [sic] my favorite. Does that answer your question[?] You will find out Tuesday morning ... lol
>
> * * *
>
> question 7: blush blush - this must have been a hard question for you to ask. I am proud of you[.] I have no real preference in weather [sic] you have hair or no hair on your p***y. Its really up to you. [S]o if you have a groomed dollar sign on your p***y I am not going to take off running ... lol.

*Id.* at 127.  The next day, Hernandez sent Holmes an explicit e-mail saying: "I love cumming when you are on top.  The reason: because I get to see you and feel you [sic] expressions . . . mmmh. [P]ut it on the list."  *Id.* at 130.  Hernandez also sent many e-mails describing his sexual fantasies about Holmes, including the following:

> We both are walking into a hotel room very businesslike . . . We walk down the hallway toward 214 and kissing as we walk.  We open the door, rush inside and continue the intense kissing.  Slowly pieces of your clothes start coming off.  I push you against the door from the inside and proceed to raise your skirt and I go to one knee.  I then start licking your p***y so good[.] I placed one leg on the couch near by and was kissing you through your underwear[.] I play with my tongue on your p***y licking you getting you wetter . . . . mmm . . . I can hear you enjoying these crazy moment [sic.]
> To be continued . . .

*Id.* at 131.  The record contains e-mails from Hernandez to Holmes of this nature through May 1, 2014, *see id.* at 257, 259-64, including an e-mail asking Holmes to tell him "her wildest fantasies" so he could "make them come true."  *Id.* at 266.  In that same e-mail, in addition to detailing sexual activities graphically, he stated: "This might not be very romantic but you have to understand that there is a piece of our chemistry that has absolutely nothing to do with Romance or pretty.  There

is a part of our relationship that is just wild[,] free[,] animalistic[,] sexual desire in its purest form." *Id.*

In addition to the voluminous e-mail exchanges between Holmes and Hernandez described above, Holmes and Hernandez's relationship became physical beginning on March 14, 2014, when they had their first sexual encounter. *Id.* at 448. In March 2014 and April 2014, Holmes and Hernandez met and engaged in sexual relations on numerous occasions in various locations, including parking lots, hotels, and at NTHCL's facility in the early morning hours before other employees arrived. *Id.* at 448-50.[6]

During this time, Holmes was living with her fiancé Gary Dutchover ("Dutchover"). The two were planning to be married in October 2014. Dutchover found out about the affair between Holmes and Hernandez in the beginning of May 2014. On May 3, 2014, he confronted Holmes and she admitted to her affair with Hernandez. Dutchover called off the wedding and took back the engagement ring. On May 3, 2014, Dutchover called Hernandez's wife to tell her about her husband's relationship with Holmes and also called one of FMA's principals, Tim Montague ("Montague"), to inform him about the affair. After speaking with Dutchover, Montague conversed briefly with Holmes on the telephone to set up a meeting in Grand Prairie on May 5, 2014, to discuss

---

[6] Holmes objects to Hernandez's affidavit testimony that he and Holmes had a sexual relationship as inadmissible hearsay under Federal Rule of Evidence 801. *See* Pl.'s Obj. to Def.'s Summ. J. Evid. 2 (Doc. 76-3). As previously stated, *see supra* note 4, because Holmes's objection is not made with the requisite specificity, the court is under no duty to consider it. In any event, the court **overrules** this objection. Hernandez's affidavit testimony that he and Holmes met in parking lots, hotels, and at work to engage in sexual relations is based on his personal observations, which are not classified as hearsay under Federal Rule of Evidence 801(c). *See, e.g.*, *United States v. Potwin*, 136 F. App'x 609, 611 (5th Cir. 2005) (stating that officer's testimony that he observed certain acts was based on his personal observations, and therefore not hearsay). Alternatively, to the extent any of Hernandez's statements regarding their sexual encounters are hearsay, the court concludes they are nevertheless admissible under Rule 803(3) as evidence attempting to show his then-existing state of mind. *See* Fed. R. Evid. 803(3) (creating an exception to the hearsay rule when the proponent of evidence is attempting to prove "the declarant's then existing state of mind.").

the matter. On May 5, Montague, Khan, Dutchover, Holmes, and Holmes's mother held a meeting at a restaurant near Holmes's residence. Montague advised Holmes at the meeting that she would be permitted two weeks paid leave while NTHCL investigated the allegations. After being notified of the affair between Hernandez and Holmes, FMA hired a third-party investigator and instructed Hernandez to stay away from the NTHCL facility pending the investigation. Although FMA's investigation found no evidence of sexual harassment by Hernandez, citing a "breach of trust" and a loss of confidence in Hernandez, FMA demanded that Hernandez resign or he would be terminated. *Id.* at 402. Hernandez submitted his resignation effective May 9, 2014. Although the term "resignation" is used, Hernandez was effectively discharged or fired because he was "forced" to resign. Had he not resigned, he would have been discharged.

By letter dated May 15, 2014, NTHCL informed Holmes that Hernandez was no longer employed or associated with NTHCL, and that: "Your position as Customer Service Representative is still available to you. As such, we look forward to you returning to work on Monday, May 19, 2014." *Id.* at 42. Holmes did not return to work after the two weeks of paid leave, did not communicate with NTHCL about its May 15, 2014 letter inviting her to return to her position, and

never returned to work.[7] On September 25, 2015, more than a year later and after retaining Holmes on its group health insurance plan, NTHCL formally separated Holmes's employment.

Holmes never reported Hernandez's alleged sexual harassment to anyone at work or outside work and came forward only after Dutchover found out about the affair and reported it to Montague on May 3, 2014. Holmes filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of sexual harassment. Holmes received her right-to-sue letter on April 20, 2015, and filed this lawsuit on June 23, 2015.

On November 18, 2016, NTHCL filed its motion for summary judgment. The court now considers this motion.

---

[7] In her Affidavit filed in support of her response, Holmes states that after Hernandez's resignation, NTHCL "would not accommodate [her] request to work from home" and fired her. *See* Pl.'s Summ. J. App. 115, 117 (Doc. 76-2). Again invoking the "sham-affidavit" doctrine, NTHCL objects to these statements, arguing they are inconsistent with Holmes's sworn deposition testimony and, therefore, should not be considered by the court in evaluating whether she has raised a genuine dispute of material fact sufficient to defeat summary judgment. *See* Def.'s Obj. Pl.'s Summ. J. Evid. 7-9 (Doc. 81). The court **sustains** this objection. The court has scrutinized Holmes's statements in her Affidavit and her prior sworn deposition testimony, and finds that her affidavit testimony is inconsistent with, and contradicts, her previous sworn deposition testimony. *See generally S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2011) (Under the "sham affidavit" doctrine, a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit [that] contradicts, without explanation, [her] previous testimony.") (citations omitted). At her deposition, Holmes testified that she was not fired or terminated. *See* Def.'s Summ. J. App. 8. Further, she never asserted that she asked her employer to allow her to work from home. Rather, she admitted receiving NTHCL's letter informing her that Hernandez no longer worked for the company and inviting her to return to her position as customer service representative after her two-week paid leave of absence, and that, thereafter, she simply did not return to work and never responded to NTHCL's letter. *See id.* at 8, 10, 42. The court concludes that Holmes's affidavit testimony is not merely supplementing and clarifying her deposition testimony, but it contradicts her prior sworn deposition testimony that she was not fired or terminated by NTHCL but simply did not return to work. Further, Holmes offers no explanation for this inconsistency. Accordingly, the court will not consider Holmes's statement in her Affidavit that NTHCL would not accommodate her request to work from home and fired her in addressing NTHCL's Motion for Summary Judgment.

## II. Legal Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment

evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id*.; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III. Analysis

### A. Holmes's Failure to Cite to the Record

As an initial matter, in considering Holmes's response, the court notes that she repeatedly fails to cite to the record and to identify the specific page in her voluminous appendix to which she is referring. *See* Pl.'s Resp. Br. 17, 18, 19 (referring to "Pl. App. ___."). Further, in several instances, she cites to her Affidavit without citing a particular page or paragraph. *See id.* at 9, 12, 13, 16, 18. As stated directly above, conclusory or unsubstantiated assertions such as those without

evidence in support are not competent summary judgment evidence and are insufficient to create a genuine dispute of material fact. *See Eason*, 73 F.3d at 1325; *Forsyth*, 19 F.3d at 1533. Further, the court is under no obligation to comb or scour the record to find support for Holmes's response or evidence that creates a genuine dispute as to a material fact. *See Weems v. Dallas Indep. Sch. Dist.*, 260 F. Supp. 3d 719, 731 n.5 (N.D. Tex. 2017) (Lindsay, J.) (citing *Ragas*, 136 F.3d at 458); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). As the nonmovant, it is Holmes's duty to identify evidence in the record that establishes the existence of a genuine dispute of material fact. *Celotex Corporation*, 477 U.S. at 324. When the nonmovant fails to cite or refer to evidence that exists in the summary judgment record, "that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405. Holmes's repeated failure to identify competent summary judgment evidence in the record to support her arguments in opposition to NTHCL's Motion for Summary Judgment has made the court's job more onerous. In many instances, although the court has conducted a close review of Holmes's appendix, the court has been unable to find any evidence to support her conclusory assertions. In these instances, and where Holmes has failed to meet her duty to identify evidence in the record to support her assertions, as set out more fully below, the court concludes she has failed to raise a genuine dispute of material fact on that particular issue.

### B.    Holmes's Abandoned Claims

NTHCL moves for summary judgment as to Holmes's Title VII sexual harassment and retaliation claim as well as her state law claims for negligence, intentional infliction of emotional distress, battery, assault, gross negligence and negligent investigation (the "state law claims"). In her response, however, Holmes only responds to NTHCL's arguments with respect to her sexual harassment claim. She fails to address her remaining claims for retaliation under Title VII or her

state law claims, much less respond to any of NTHCL's arguments in support of its motion for summary judgment on these claims. The court concludes that Holmes has abandoned or waived her claims against NTHCL for retaliation under Title VII and her state law claims.

When a party fails to pursue a claim or defense beyond the party's initial pleading, the claim is deemed abandoned or waived. *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[]") (citation omitted). As Holmes failed to pursue her claims against NTHCL for retaliation under Title VII or her state law claims, they are no longer before the court, as she has abandoned or waived them. Accordingly, based on Holmes's abandonment or waiver of her Title VII retaliation claim and her state law claims, the court will grant summary judgment in NTHCL's favor on these claims.[8]

### C.      Holmes's Title VII Sexual Harassment Claim

Title VII of the Civil Right Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such

---

[8] In addition to arguing that Holmes has waived or abandoned many of her claims, NTHCL notes that although Holmes identifies as Count One of her Complaint "Harassment and Retaliation," "there are no allegations of retaliation in that section or elsewhere." Def.'s Summ. J. Br. 14 n.113. To allege a prima facie case of retaliation, a Title VII plaintiff must set forth allegations to show, or from which the court can reasonably infer, that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal nexus between the protected activity and the adverse employment action. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002). The court has carefully reviewed the Complaint and finds no allegations that would support a retaliation claim. To the extent Holmes intended to assert a retaliation claim, the court concludes that, in addition to abandoning or waiving this claim, she has failed to state a claim upon which relief may be granted, and her retaliation claim will be dismissed under Federal Rule of Civil Procedure 12(b)(6), as well as under Rule 56 for failure to provide any summary judgment evidence in support of a retaliation claim.

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  As the United

States Supreme Court has recognized, "[t]he phrase 'terms, conditions, or privileges of employment'

evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and

women in employment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal

quotations and citation omitted).  An employer violates Title VII when the employer allows the

workplace to be "permeated with discriminatory intimidation, ridicule, and insult . . . that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment[.]*" Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal

quotations and citations omitted).  The Court in *Harris* further noted that "[t]his standard . . . takes

a middle path between making actionable any conduct that is merely offensive and requiring the

conduct to cause a tangible psychological injury." *Id.*

Holmes may prove her sexual harassment claim either by establishing that a tangible

employment action was taken against her because of her sex (also known as *quid pro quo*

harassment) or by establishing that a supervisor with immediate or successively higher authority

discriminated against her because of her sex and created a hostile or abusive environment.  *See*

*Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998); *Burlington Indus., Inc. v. Ellerth*, 524

U.S. 742, 751 (1998); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002)*; Casiano*

*v. AT&T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000); *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d

263, 268-69 (5th Cir. 1998).  The court must first determine whether the *quid pro quo* or hostile

work environment standard applies.  *Casiano*, 213 F.3d at 283.  The determination turns on whether

Holmes has suffered a "tangible employment action," *id.*, which is defined as a "significant change

in employment status such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. If an employee can show that a tangible employment action resulted from the employee's response to the sexual harassment, the employer is vicariously liable for the actions of the supervisor under Title VII. *Casiano*, 213 F.3d at 284. If the employee did not suffer a tangible employment action, the suit is a hostile work environment action. In this case, on the basis of the Complaint as well as the summary judgment evidence, viewed in the light most favorable to Holmes as the nonmovant, the court perceives nothing in her evidence or inferences from it supporting a sexual harassment claim based on a tangible employment action. Holmes has not alleged a tangible employment action or provided even a scintilla of competent summary judgment evidence that she suffered a tangible employment action.[9] Further, as NTHCL correctly notes in its reply brief, "Ms. Holmes' Brief . . . does not in any way suggest that Ms. Holmes recognizes any claim under Title VII other than one for hostile workplace environment sexual harassment." *See* Def.'s Reply Br. 4 n.13 (Doc. 79). Having determined the absence of a tangible employment action, "which absence pretermits the quid pro quo analysis (*Casiano*, 213 F.3d at 285), the court will analyze the case as a claim for hostile work environment.

To establish a sexual harassment claim based on hostile work environment, the employee must show: (1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual

---

[9] In her response brief, Holmes includes a list of what she deems "tangible employment actions." *See* Pl.'s Resp. Br. 7-8. She does not, however, tie this list to any arguments in her brief. Moreover, the only item on her list that would constitute a "tangible employment action" is her assertion, citing to her Affidavit, that "NTHCL fires Plaintiff." *See id.* at 8 (citing Pl.'s Summ. J. App. 117). As previously noted by the court, *see supra* note 7, the court has already sustained NTHCL's objection under the "sham affidavit" doctrine to Holmes's affidavit testimony that she was fired, as it contradicts her deposition testimony that she was not fired or terminated, but instead chose not to return to her position after her two-week paid leave of absence, notwithstanding NTHCL's unambiguous letter notifying her that Hernandez was no longer associated with the company and that her position was available to her.

harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Harvill v. Westward Commn'cs, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999); *Pfeil v. Intercom Telecomm.*, 90 F. Supp. 2d 742, 748 (N.D. Tex. 2000). In *Faragher* and *Ellerth*, the Supreme Court modified this test with respect to cases where the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *Watts*, 170 F.3d at 509. In such cases, the employee need only meet the first four elements of the test. If a plaintiff can prove the first four elements, an "employer is subject to vicarious liability to a victimized employee." *Id.* (quoting *Faragher*, 524 U.S. at 807).

NTHCL argues that it is entitled to summary judgment because Holmes fails to raise a genuine dispute of material fact that the alleged harassment was unwelcome (the second prong of her prima facie case), and that it affected a "term, condition, or privilege" of her employment (the fourth prong of her prima facie case). The court first addresses NTHCL's argument that Holmes fails to raise a genuine dispute of material fact that the alleged harassment was unwelcome.

### 1. Unwelcome sexual harassment

"Unwelcome sexual harassment" includes "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or uncited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 701 (5th Cir. 2004) (quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)). "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor*, 477 U.S. at 68 (quoting 29 C.F.R. § 1604.11(a)).

"[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII." *Id.* Whether Hernandez's sexual advances were "unwelcome" under Title VII cannot be determined by Holmes's subjective state of mind. The Supreme Court holds that "[t]he correct inquiry is whether [plaintiff] *by her conduct* indicated that the alleged sexual advances were unwelcome." *Id.* (emphasis added). Generally, "whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id.* This general premise, however, does not necessarily preclude summary judgment in all cases as to whether the alleged sexual harassment or conduct is unwelcome:

> Whether a defendant's conduct is welcome indeed may in some cases be an intensely factual inquiry that turns largely on credibility determination, but that does not preclude summary judgment when, accepting as true the plaintiff's sworn assertions, the uncontroverted evidence still demonstrates that the plaintiff solicited or incited the alleged harassment.

*Greco v. Velvet Cactus, LLC*, 2014 WL 2943600, at *9 (E.D. La. 2014) (internal citations and punctuation omitted) (dismissing an employee's Title VII sexual harassment claim against his employer because uncontroverted evidence demonstrated that the employee's behavior failed to send a consistent signal that the alleged harasser's conduct was unwelcome).

Further, if an employee engaged in the same type of workplace conduct of which she complains in court, "she must be able to identify with some precision a point at which she made known to her co-workers or superiors that such conduct would hencefor[th] be considered

offensive." *Loftin-Boggs v. City of Meridian, Miss.*, 633 F. Supp. 1323, 1327 n.8 (S.D. Miss. 1986), *aff'd sub nom. Loftin-Boggs v. Meridian*, 824 F.2d 971 (5th Cir. 1987).[10]

In her opposition brief, Holmes argues that whether the sexual relationship between her and Hernandez was welcome is a question for the trier of fact, and that her e-mail comments to him were "an attempt to appease him, to placate him, to tell him what he wanted to hear." Pl.'s Resp. Br. 16 (Doc. 76-1). Holmes does not cite the court to any evidence in the record to support this assertion. As already stated, the court is under no obligation to comb or scour the record to find support for Holmes's response or evidence that creates a genuine dispute as to a material fact. *See Malacara*, 353 F.3d at 405. As the nonmovant, it is incumbent upon Holmes to identify evidence in the record that establishes the existence of a genuine dispute of material fact. *Celotex Corporation*, 477 U.S. at 324. When the nonmovant fails to cite or refer to evidence that exists in the summary judgment record, "that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405. In any event, in diligently searching through her appendix, the court has located support for this assertion in her Affidavit. *See* Pl.'s Summ. J. App. 5 (Doc. 76-2). As previously stated, however, whether or not Holmes was trying to appease Hernandez is not the relevant inquiry; instead, as the Supreme

---

[10] In *Loftin-Boggs*, the plaintiff employee had submitted a grievance regarding a co-worker's alleged harassment, but the court ruled against her on her sexual harassment claim because "the evidence did not show that her conduct or her reaction to others' conduct changed subsequently." *Loftin-Boggs*, 633 F. Supp. at 1326-27. As one district court recently noted, although *Loftin-Boggs* was decided after a trial rather than on summary judgment, which allowed the judge to make credibility assessments in reaching his conclusion, "[nonetheless, his reasoning is equally persuasive in the context of a motion for summary judgment. The question simply becomes whether there is a genuine factual dispute as to whether [the employee] had identified a specific point in time at which [she] indicated that [the alleged harasser's] conduct was no longer welcome and whether [the employee's] conduct going forward was consistent with that message." *Greco v. Velvet Cactus, LLC*, 2014 WL 2943600, at *8 n.90 (E.D. La. 2014).

Court stated in *Meritor*, "[t]he correct inquiry is whether [plaintiff] *by her conduct* indicated that the alleged sexual advances were unwelcome." 477 U.S. at 68 (emphasis added).

Holmes cites one case in support of her argument: *Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006). She does not analyze the facts of the case or explain why it supports her position. *Clegg* is readily distinguishable from this case. In *Clegg*, the plaintiff brought a Title VII sexual harassment suit against her supervisor and employer. In support of its argument that Clegg could not recover for harassment, her employer argued that an e-mail she sent her supervisor "asking him to talk dirty to her" was evidence "that Clegg indicated, by her conduct, that [her supervisor's] advances were welcome." *Id.* at 25 n.7. Clegg later contended that this e-mail was a joke. *Id.* Rejecting the employer's argument, the Third Circuit in a footnote stated with specific reference to this e-mail that although Clegg's "conduct may raise a question as to whether [the alleged harassing conduct] was unwelcome, it does not prove as a matter of law that [she] invited what allegedly followed." *Id.* As NTHCL argues in its reply brief, "[t]he record in this case, of course, stands in stark contrast to that faced by the court in *Clegg*. Ms. Holmes did not write a single e-mail that could potentially be construed as 'a joke.' She wrote dozens of e-mail messages that leave no room for ambiguity." Def.'s Reply Br. 5 (Doc. 79). The court agrees. Based on the content of the e-mails already quoted by the court at length, as well as those in NTHCL's summary judgment appendix that the court has not quoted due to spatial constraints, the *Clegg* case is easily distinguished on this basis alone and lends little to no support to Holmes's arguments.

Further, as *Clegg* is an opinion of the Third Circuit Court of Appeals, it is not binding on this court. Accordingly, the court declines to accept the reasoning of *Clegg* and the result reached by the Third Circuit insofar as its applicability to the distinct facts of this case.

Further, turning to the standard set forth in *Loftin-Boggs*, *supra*, Holmes does not identify a particular point at which she clearly indicated that, going forward, Hernandez's conduct would be considered offensive. *See Loftin-Boggs*, 633 F. Supp. at 1327 n.8. In her response brief, she cites the following language extracted from one e-mail: "Personally, I don't think it is right. I totally disagree with relationships in the work place. This is one of the reasons I resisted for so long." Pl.'s Resp. Br. 17 (Doc. 76-1). She describes these as "magic words to determine whether a sexual advance was unwelcome." *Id.* As NTHCL notes in its reply brief, however, she misleadingly omits the remainder of the same e-mail message, which provides the full context:

> But I am in love with you and I have an internal conflict going on. I am not willing to end it, but I know its [sic] not right. Its [sic] not right not only because we work together, you are my boss, but also because you are married and that makes me feel like a terrible person also. BUT I am not willing to let you go.

Def.'s Summ. J. App. 273. Viewing the entire e-mail, and not just the portion quoted by Holmes, the court concludes that this e-mail cannot reasonably be interpreted under *Loftin-Boggs* as a particular point at which Holmes clearly indicated that, going forward, Hernandez's conduct would be considered offensive.[11]

In examining the "record as a whole" and considering the "totality of the circumstances" (*Meritor*, 477 U.S. at 69), including the plethora of e-mail communications between Holmes and Hernandez in which she unambiguously stated her desires to have sexual relations with him,

---

[11] In her response brief, Holmes asserts that Hernandez deleted e-mail messages in which she complained of his sexual advances. *See* Pl.'s Resp. Br. 17. NTHCL argues that Holmes "has offered no evidence whatsoever that any such 'destruction' of 'critical email messages' actually took place." Def.'s Reply Br. 3 n.12. The court agrees. While evidence shows that Hernandez had administrative rights, there is no evidence from which the court can reasonably conclude that he deleted e-mails in which Holmes expressed that his conduct was unwelcome. Further, at her deposition, Holmes could not recall with any clarity or substance the contents of any of these purportedly deleted e-mails. *See* Def.'s Summ. J. App. 29.

described how much she enjoyed these encounters, how much she wanted to be with him, missed him, and loved him, and in light of Holmes's failure to provide any evidence that she clearly indicated to Hernandez that his conduct would be considered offensive, the court concludes that Holmes has failed to present evidence from which a reasonable juror could conclude that Hernandez's sexual advances were "unwelcome." Instead, the only evidence of her conduct indicates that she welcomed and invited Hernandez's sexual advances. While the court recognizes that, in many instances, the question of whether particular conduct was unwelcome presents problems of proof and can turn on credibility determinations committed to the trier of fact, *see Meritor*, 477 U.S. at 68, that does not preclude summary judgment in cases like this when, accepting as true the plaintiff's sworn assertions, it cannot be reasonably disputed that, based on her own conduct, Hernandez's interactions with Holmes were welcomed and encouraged. *See, e.g.*, *Zhao v. Kaleida Health*, 2008 WL 346205 (W.D.N.Y. Feb. 7, 2005) (citing *Loftin-Boggs*, 633 F. Supp. at 1327 n.8) (granting summary judgment in employer's favor on Title VII hostile work environment sexual harassment claim in which plaintiff alleged a series of unwelcome sexual advances culminating in assault, in light of voluminous and uncontroverted e-mails demonstrating that sexual conduct by defendant was welcome).

In sum, because no reasonable juror could conclude that Holmes was subjected to unwelcome sexual advances by Hernandez, she cannot establish her hostile work environment claim, and summary judgment in NTHCL's favor is warranted. Accordingly, on this basis, the court will grant NTHCL's motion for summary judgment and enter judgment as a matter of law in its favor on Holmes's Title VII sexual harassment claim.

In ruling on whether Holmes was subjected to unwelcome sexual harassment or conduct, the court in no way approves or condones Hernandez's conduct. His conduct is no cause for approbation. His conduct was ignominious, reprehensible, and showed a total lack of judgment on his part, as he was the general manager of NTHCL. The record, however, shows that Holmes *and* Hernandez were mutual and willing participants in the sexual banter and conduct, and no competent summary judgment evidence indicates otherwise. Based on the record, the court determines that a reasonable jury would not conclude that Hernandez's conduct was unwelcome.

### 2. A "term, condition, or privilege" of employment

As an alternative basis for summary judgment, NTHCL argues that Holmes has failed to raise a genuine dispute of material fact that the alleged harassment was sufficiently severe or pervasive to affect a "term, condition, or privilege," of her employment. Regarding this fourth element of a prima facie case for a Title VII sexual harassment hostile work environment claim,

> [h]arassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation. In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration. This includes the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted); *see also Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 538 (N.D. Tex. 2005) (Lindsay, J.) ("Central to the court's inquiry into a hostile environment claim is whether the alleged harasser's actions have undermined the victim's workplace competence, discouraged her from remaining on the job, or kept her from advancing in her career.") (citations omitted). "A hostile

work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Merely offensive conduct is not actionable. *See Harris*, 510 U.S. at 21. The legal standard for workplace harassment is "high." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003). "[T]he Supreme Court has warned that these high standards are intentionally demanding to ensure that Title VII does not become a general civility code, and when properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language." *Howard v. United Parcel Serv., Inc.*, 447 F. App'x 626, 632 (5th Cir. 2011) (per curiam) (citations and internal quotation marks omitted) (quoting *Faragher*, 524 U.S. at 788).

On the record before the court, viewing all evidence in the light most favorable to Holmes and drawing all reasonable inferences in her favor, the court concludes that Holmes has failed to present a genuine dispute of material fact that Hernandez's conduct affected a "term, condition, or privilege" of her employment. As already stated in the previous section, Holmes points to no evidence that she perceived Hernandez's alleged conduct to be hostile or abusive. Instead, the e-mails quoted at length above evidence that she welcomed a sexual relationship with Hernandez. Further, Holmes provides no evidence that she was unable to do her job as a result of Hernandez's conduct. *See, e.g.*, *Moyer v. Jos. A. Bank Clothiers, Inc.*, 2013 WL 4434901, at *12 (N.D. Tex. Aug. 19, 2013) (Lindsay, J.), *aff'd*, 601 F. App'x 247 (5th Cir. 2015) (finding it significant that the plaintiff "was nonetheless able to perform her job" and was "a good employee and met all of her job

requirements"); *Davis v. Wal-Mart Stores, Inc.*, 2007 WL 836860, at *9 (N.D. Tex. Mar. 19, 2007) (Lindsay, J.) ("Plaintiff has failed to submit evidence that the alleged conduct unreasonably interfered with her work performance."). Holmes has produced no evidence showing that she failed to perform her job, was discouraged from continuing to work for NTHCL and sought employment elsewhere, or failed to advance in her career as a result of the harassment. The only evidence in the record shows that Holmes was performing her job in a satisfactory manner until Dutchover confronted her about her affair with Hernandez and reported it to Montague.[12] It was only after her two-week paid leave of absence that she did not return to work.

Because no reasonable juror could conclude that Hernandez's conduct affected a "term, condition, or privilege of employment," that is, that the alleged sexual harassment was sufficiently severe or pervasive so as to alter the conditions of Holmes's employment and create a hostile work environment, she cannot establish her hostile work environment claim. Accordingly, in the alternative to granting summary judgment in NTHCL's favor on the basis that Holmes failed to raise a genuine dispute of material fact that Hernandez's conduct was unwelcome, the court will grant NTHCL's motion for summary judgment and enter judgment as a matter of law in its favor on Holmes's Title VII sexual harassment claim on this basis as well.

---

[12] The court rejects Holmes's assertion that not being allowed to work from home after Hernandez's resignation affected a term, condition, or privilege of her employment. *See* Pl.'s Resp. Br. 18 (Doc. 76-1). Once again, Holmes fails to cite to specific evidence in the record to support her assertion that the alleged sexual harassment affected a "term, condition, or privilege" of her employment. Rather, her brief cites to "Pl.'s App. __." As previously stated, it is Holmes's duty to identify evidence in the record that establishes the existence of a genuine dispute of material fact. *Celotex Corporation*, 477 U.S. at 324. When the nonmovant fails to cite or refer to evidence that exists in the summary judgment record, "that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405. In addition, the court has already sustained NTHCL's objection under the "sham affidavit" doctrine, to Holmes's affidavit testimony that contradicts and is inconsistent with, her sworn deposition testimony that, after her two-week paid leave of absence, she simply did not return to work, notwithstanding NTHCL's unambiguous letter notifying her that Hernandez was no longer associated with the company and that her position was available to her. *See supra* note 7.

### D. *Ellerth/Faragher* Affirmative Defense

The Supreme Court has explained that Title VII was designed to encourage "antiharassment policies and effective grievance mechanisms." *Ellerth*, 524 U.S. at 764. "Normally, an employer is strictly liable for a supervisor's harassment of an individual whom he or she supervises." *Pullen v. Caddo Parish Sch. Bd.*, 830 F.3d 205, 209 (5th Cir. 2016) (citation omitted). "The *Ellerth/Faragher* affirmative defense is an exception and is available to employers when a plaintiff alleges sexual harassment by a supervisor but does not claim that the harassment resulted in a tangible employment action." *Id.* (citation omitted). "The defense has two elements. First, the employer must show that it exercised reasonable care to prevent and correct sexual harassment. Second, it must establish that the employee unreasonably failed to take advantage of preventive or remedial opportunities provided by the employer." *Id.* at 209-10 (citation omitted); *see also Faragher*, 524 U.S. at 807.

NTHCL has asserted the *Ellerth/Faragher* affirmative defense to avoid vicarious liability for any of Hernandez's alleged actions. *See* Answer (Doc. 4) ¶¶ 18-20. In the alternative to its argument that it is entitled to summary judgment because Holmes has failed to raise a genuine dispute of material fact as to her sexual harassment hostile work environment claim, NTHCL seeks summary judgment on its *Ellerth/ Faragher* affirmative defense, contending that it has met both prongs of its affirmative defense on the summary judgment evidence and is, therefore, entitled to judgment as a matter of law on Holmes's sexual harassment claims.

The undisputed facts show that NTHCL has satisfied the affirmative defense as a matter of law. With respect to the first element, which focuses on the company's conduct, it is undisputed that NTHCL had a detailed "Policy Against Harassment." It is further undisputed that as part of her

orientation on her first day on the job, Holmes received a copy of NTHCL's Employee Handbook "outlin[ing] the policies and work rules of the company and [her] responsibilities as an employee." Defs.' Summ. J. App. 46. Holmes signed an acknowledgment page confirming she received the Employee Notebook and would read it. *Id.* The Employee Handbook, as previously stated, contains a "Policy Against Harassment," which expressly addresses the issue of sexual harassment, includes a detailed description of the types of conduct that can be considered sexual harassment, and contains a specific directive to report any conduct viewed as harassing to one's manager, supervisor, or general manager. *Id.* at 44-45.

When Hernandez's alleged harassment was reported to Montague on May 3, 2014, it is undisputed that FMA and NTHCL investigated the claim promptly and informed Hernandez not to return to the Grand Prairie facility and then informed him that he needed to resign or would be terminated, and this occurred less than one week of first finding out about the alleged harassment. From this uncontroverted evidence, the court concludes that it is undisputed that NTHCL exercised reasonable care to prevent and to promptly investigate and address the reported sexual harassment of Holmes. In response, Holmes cites to one case—a case in which the court held that an employer's policy was deficient in a way that would negate the employer's *Ellerth/Faragher* affirmative defense—to support her argument that NTHCL's "Policy Against Harassment" was deficient. *See* Pl.'s Resp. Br. 19 (citing *E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 463-65 (5th Cir. 2013)). The policy considered by the Fifth Circuit in *Boh Brothers*, unlike NTHCL's policy, *supra*, was a "vague and general antidiscrimination policy without any mention of sexual harassment, the policy did not specify complaint procedures, and employees were not informed of the policy save for inconspicuous postings that the employees did not read or see."

*Pullen*, 630 F.3d at 210 (citing *Boh Bros.*, 731 F.3d at 463). As stated by the Fifth Circuit, the policy set forth only "generic statements" such as "[a]ll working conditions will be maintained in a non-discriminatory manner." *Boh Bros.*, 731 F.3d at 463.

NTHCL contends that the "Policy Against Harassment" in its Employee handbook differs from that in *Boh Brothers*, in that its policy "expressly addresses the issue of sexual harassment in no uncertain terms, including both a description of the types of conduct that can be considered sexual harassment and a specific directive to report any conduct viewed as harassing" to one's manager, supervisor, or general manager. *See* Def.'s Reply Br. 12 (Doc. 79). After comparing NTHCL's policy with the policy at issue in *Boh Brothers*, the court agrees. In addition, NTHCL's Policy Against Harassment was contained in the Employee Handbook, which Holmes acknowledged receiving and agreed to read. Further, although Holmes asserts that "[t]he policies and procedures of NTHCL were clearly a facre[,]" Pl.'s Resp. Br. 19 (Doc. 76-1), it is undisputed that, after receiving its first report about Hernandez's alleged harassing conduct, Hernandez was instructed not to return to the Grand Prairie facility pending the investigation, and ultimately ordered to either resign or be terminated, after which he resigned, all within less than one week of the first report of his alleged sexual harassment. Finally, the policy unambiguously specifies that an employee was expected to report any sexually harassing conduct to her manager, supervisor, or general manager.

With regard to the second element of the *Ellerth/Faragher* affirmative defense, which focuses on whether the employee unreasonably failed to take advantage of an employer's preventative or corrective opportunities, the record demonstrates that Holmes never reported the harassment of which she complains, notwithstanding that she acknowledged receiving the Employee Handbook and the "Policy Against Harassment," until after Dutchover informed Montague of

Hernandez's alleged harassment on May 3, 2014. From this evidence, the court concludes that Holmes failed to avail herself of any preventative or corrective opportunities provided by NTHCL, and she has failed to offer any legitimate reason for her failure to do so. *See Faragher*, 524 U.S. at 807; *see also Casiano*, 213 F.3d at 287 (employee unreasonably failed to take advantage of employer-provided preventive or corrective opportunities when he suffered at least fifteen propositions over a four-month period but never reported any of the incidents until months after the last one); *Scrivner v. Socorro Ind. Sch. Dist.*, 169 F.3d 969, 971 (5th Cir. 1999) (employee failed to reasonably avail herself of employer's preventive and corrective sexual harassment policies, in part, because "from the summer of 1995 to March 1996, [the plaintiff] never complained about [her principal's] increasingly offensive behavior."). Further, Holmes's statement in her Affidavit that it was not clear to her to whom she should report Hernandez's conduct is not supported by the record. The policy itself explicitly stated that the conduct was to be reported to either her manager or supervisor. Further, the undisputed facts show that on May 3, 2014, Hernandez's conduct was reported to FMA's principal, Montague. On this record, the court concludes that NTHCL has satisfied the second element of the affirmative defense. No reasonable trier of fact could find that Holmes has raised a genuine dispute of material fact that she took advantage of NTHCL's preventive or corrective opportunities.

In light of the foregoing, the court determines that, even had Holmes presented evidence creating a genuine dispute of material fact regarding whether the alleged sexual harassment was unwelcome or whether it affected a "term, condition, or provilege" of her employment, her claim nevertheless fails because NTHCL has demonstrated, under these facts, that it is entitled to summary judgment on the *Ellerth*/*Faragher* affirmative defense. For all of the foregoing reasons, the court

concludes that no genuine disputes of material fact exist regarding the *Ellerth/Faragher* defense, and because NTHCL has established both requirements of its affirmative defense, NTHCL is, therefore, entitled to judgment as a matter of law on Holmes's sexual harassment hostile work environment claim.

**E.** **Evidentiary Objections**

NTHCL has filed various objections to Holmes's summary judgment evidence, and Holmes has filed various objections to NTHCL's evidence. To the extent the court has relied upon any evidence to which an objection was made, the court has ruled on the objection in the footnotes to this decision. Holmes has also included with her appendix an affidavit from her expert witness, Shari Julian, Ph. D., a licensed professional counselor *See* Pl.'s Summ. J. App. 116-213 (Affidavit and attachments). Holmes does not identify for the court the capacity in which Dr. Julian will be providing expert testimony. In her response brief, Holmes cites to Dr. Julian's Affidavit *once*, namely, to support her assertion that not being allowed to work from home caused her to be subjected to ridicule in the workplace. *See* Pl.'s Resp. Br. 18 (Doc. 76-1). Holmes fails to identify a specific page in her appendix to support this assertion and, as previously noted by the court, it is not incumbent upon the court to scour the record for evidentiary support. Further, under the "sham affidavit" doctrine, the court previously sustained NTHCL's objection to Holmes's statement in her Affidavit that after Hernandez resigned, she was not permitted to work from home and was fired by NTHCL, as these statements contradicted her sworn deposition testimony that she was not terminated or fired, but just never went back to work, notwithstanding NTHCL's open invitation for her to return to work. *See supra* note 7. As the only basis for which Holmes cites Dr. Julian's Affidavit has been rendered moot by the court's ruling, Dr. Julian's testimony is not relevant to any

matter at hand and, therefore, will not be considered. On this basis alone, the court **sustains** NTHCL's objection to the Affidavit of Dr. Julian submitted with Holmes's appendix.

In addition, the court agrees with NTHCL that Holmes has failed to meet her burden of showing how Dr. Julian's testimony satisfies Rule 702 of the Federal Rules of Evidence.

Rule 702 of the Federal Rules of Evidence provides guidance on the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Further, the Court clarified that the *Daubert* gatekeeping function applies to all forms of expert testimony, not just scientific. *Kuhmo Tire Company v. Carmichael* 526 U.S. 137, 141 (1999). The district court fulfills its role as gatekeeper by screening the proposed evidence and evaluating it in light of the specific circumstances of the case to ensure that it is reliable and sufficiently relevant to assist the jury in resolving the factual disputes. *Daubert,* 509 U.S. at 592-93. The Fifth Circuit on more than one occasion has reminded district courts of their important gatekeeping function. *See Carlson v.*

*Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("Our point is that the ultimate issue in such cases can too easily become whatever an expert witness says it is, and trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").

Dr. Julian's opinions concerning whether the alleged harassment was welcome or regarding various human resources issues are not necessary, as there are no issues before the court requiring any specialized knowledge. The issues before the court that remain after the court has granted judgment as a matter of law in NTHCL's favor on Holmes's abandoned claims are: whether Hernandez's conduct was unwelcome; whether his alleged conduct affected a "term, condition, or privilege" of Holmes's employment, and whether NTHCL is entitled to prevail on its *Ellerth/Faragher* affirmative defense. The matters have been fully briefed by the parties, and Dr. Julian's Affidavit is not helpful to the court. Otherwise stated, the issues before the court are not so impenetrable as to require the aid of an expert. Further, the court concludes that Dr. Julian does brings to the trier of fact "more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d at 1233.

In sum, the court determines that Holmes has not met her burden of showing that Dr. Julian's proffered expert testimony is relevant or helpful under Rule 702, *Daubert*, *supra*, and *Kuhmo Tire, supra*. As such, the court need not address whether Dr. Julian's Affidavit contains conclusions that are reliable. The court, therefore, **sustains** NTHCL's objections to Dr. Julian's Affidavit.

With respect to all remaining objections, they are **overruled as moot** because the court has not relied on that evidence in reaching its decision.

## IV.    Conclusion

For the reasons herein stated, no genuine dispute of material fact exists as to any federal or state claims asserted by Holmes, and NTHCL is entitled to judgment as a matter of law. Accordingly, the court **grants** Defendant's Motion for Summary Judgment (Doc. 72), and all of Holmes's claims and this action are **dismissed with prejudice**. As required by Federal Rule of Civil Procedure 58, a judgment will issue by separate document.

**It is so ordered** this 18th day of January, 2018.

Sam A. Lindsay
United States District Judge